835 So.2d 410 (2002)
In re Jerry F. PALMER.
No. 2002-B-1780.
Supreme Court of Louisiana.
December 4, 2002.
Rehearing Denied February 14, 2003.
Charles B. Plattsmier, Baton Rouge, Eric K. Barefield, New Orleans, for applicant.
Gary J. Elkins, Jerry F. Palmer, Richard L. Traina, New Orleans, for respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS.
PER CURIAM.
This disciplinary proceeding arises from one count of formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Jerry F. Palmer, an attorney licensed to practice law in Louisiana.

UNDERLYING FACTS
In October, 1988, respondent was hired by Bomar Investment Corporation ("Bomar") to act as general counsel for its family of insurance companies. These insurance companies were domiciled in various states, including Louisiana, and some operated in about twenty to thirty states.
Approximately two months after taking the job, respondent realized the insurance companies were either insolvent or almost insolvent. Respondent learned the poor financial condition of the companies stemmed from the fraudulent actions of Mark Herman, Bomar's majority owner *411 and CEO, who was siphoning company funds for his own personal benefit. Although he was aware of the companies' poor financial condition, Mr. Herman allowed the companies to continue to sell insurance policies and investments, including annuities and IRAs, and actively solicited business by misrepresenting the companies' financial conditions.
Each of the companies had different insurance specialities and investors; however, none of them could financially stand on their own in the absence of the other companies. Upon reviewing financial records, respondent determined the few available assets belonging to the companies were being switched from one company's financial records to the others through sham transactions. Respondent's primary responsibility was to create and submit fraudulent materials to regulators to further the illegal insurance scheme, which he did.
Subsequently, in 1989, Mr. Herman sold the assets of Bomar to Bob Schamburger and Gary Jackson for $300,000, both of whom knew the family of insurance companies was insolvent. From 1989 to 1991, Mr. Schamburger and Mr. Jackson furthered Mr. Herman's past illegal scheme, with the assistance of respondent and several others, by distributing advertising materials, legal documents and financial reports to the public and insurance regulators which falsely stated the insurance companies were financially sound.
Respondent was aware Mr. Schamburger and Mr. Jackson were personally stealing millions of dollars from the various companies. Despite this knowledge, respondent knowingly prepared and filed legal documents and fraudulent quarterly financial reports which involved the gross over-valuation of assets, fraudulent multi-million dollar real estate deals and sham mortgage loans. In doing so, respondent often backdated financial and transactional documents and corporate records. He also wrote to various insurance officials, including the General Counsel of the Nebraska Department of Insurance, misrepresenting critical financial information. Later, when individuals in the nation-wide insurance industry published articles questioning the solvency of the insurance companies, respondent drafted correspondence under the signature of his supervisor threatening suit against the respective authors, although respondent was aware the published allegations were generally accurate.
By the end of 1991, insurance regulators from several states were actively investigating Mr. Schamburger and Mr. Jackson. During the course of the investigation, respondent received a federal subpoena issued by the United States Postal Inspector. Thereafter, the companies were shut down and placed under conservation. However, during this time, Mr. Schamburger and Mr. Jackson still attempted to operate the companies behind the scenes. Rather than participating in the continued fraud, respondent retained legal counsel and provided extensive cooperation to the United States Attorney's Offices in Louisiana and Florida. Around the same time, respondent accepted a position with a New Orleans law firm and engaged in a commercial transactions practice until January, 1999.
In 1993, respondent entered a plea of guilty in federal court in Louisiana to engaging in a conspiracy to commit an offense in violation of 18 U.S.C. § 371[1] *412 stemming from his illegal conduct committed in connection with the insurance fraud.[2] In connection with the plea, respondent was assured by federal authorities he would not be charged in any other federal jurisdiction or state court in Louisiana if he continued to cooperate with federal and state authorities. Respondent's guilty plea was sealed and his sentencing was delayed for approximately six years, while he provided continued cooperation to the United States Attorney's Offices in Louisiana and Florida, as well as to the Louisiana Department of Insurance. Respondent assisted federal and state authorities by reconstructing the vast scheme and testifying at the criminal and civil racketeering trials in both states over a period of several years.
In October, 1999, at the time of sentencing (six years after respondent's plea), the United States Attorney's Offices in Louisiana and Florida filed a Motion for Sentencing Departure from the Sentencing Guidelines based upon respondent's substantial assistance in its criminal investigations over the decade. Specifically, in addition to several others who wrote letters requesting leniency for respondent, Benjamin W. Beard, Deputy U.S. Attorney for the Northern District of Florida, wrote the government would not have prevailed in the Florida criminal proceedings in the absence of the cooperation of respondent and another individual, the only two Bomar employees who assisted the government.
Subsequently, respondent was sentenced relative to his federal guilty plea to five years probation, six months residence at a half-way house and payment of restitution in the amount of $50,000 to the Louisiana Department of Insurance Liquidation.[3] At his sentencing hearing, Judge G. Thomas Porteous, the presiding judge, stated he believed respondent had taken responsibility for his actions by notifying all of his clients and preparing to go forward with the institution of disciplinary proceedings.

DISCIPLINARY PROCEEDINGS

Notice of Misconduct
In January, 1999, after the seal on his guilty plea was lifted, respondent voluntarily ceased the practice of law and notified his clients of his resignation. He assumed a paralegal position at a substantially reduced salary with the law *413 firm where he had been employed as an attorney. In addition, respondent finally notified the ODC of his misconduct and requested that disciplinary proceedings be commenced.[4] Respondent and the ODC then filed a motion in this court, requesting respondent be placed on interim suspension. On May 26, 1999, this court granted the motion and suspended respondent on an interim basis. In re: Palmer, 99-1395 (La.5/26/99), 736 So.2d 162.

Formal Charges
After investigation, the ODC filed one count of formal charges against respondent alleging violations of Rules 8.4(a) (violating or attempting to violate the Rules of Professional Conduct), 8.4(b) (commission of a criminal act adversely reflecting on a lawyer's honesty, trustworthiness, or fitness as a lawyer), 8.4(c) (engaging in conduct involving deceit, dishonesty, fraud, or misrepresentation) and 8.4(d) (engaging in conduct prejudicial to the administration of justice) of the Rules of Professional Conduct. Respondent filed an answer admitting to the allegations of misconduct with the exception of violating Rule 8.4(d).

Formal Hearing
A formal hearing was conducted exclusively for the presentation of mitigating evidence. Respondent testified as to his knowledge of, and involvement in, the insurance scheme. He stated, throughout 1989, the companies "embarked on a course of how do you fix this ... plugging holes" so as to hide the insolvency of the companies and corrupt actions of its owners, officers and employees. While he asserted he did not have any equity in the businesses, he acted as corporate secretary for most, if not all, of the companies, as well as held other corporate officer positions. He contended his job with the companies primarily consisted of record-keeping and documentary transactions. Respondent admitted that he breached his fiduciary responsibility to the policyholders. He testified he intended to do the things he did, but not the consequences. Respondent conceded he failed to notify anyone of the criminal activities and simply "looked the other way." He stated he was most sorry for the policyholders in states where there was no guaranty fund to insure against losses, such as in Louisiana and Colorado. Respondent testified as to the detrimental effects his actions had on his family.
Finally, respondent produced several witnesses and documentary evidence attesting to his good character and reputation. Moreover, he submitted substantial documentary evidence relative to his extensive and unprecedented cooperation with federal and state authorities.[5]

*414 Recommendation of the Hearing Committee

Relying on respondent's own admission, the committee concluded respondent violated Rules 8.4(a) (violating or attempting to violate the Rules of Professional Conduct), 8.4(b) (commission of a criminal act adversely reflecting on a lawyer's honesty, trustworthiness, or fitness as a lawyer) and 8.4(c) (engaging in conduct involving deceit, dishonesty, fraud, or misrepresentation) of the Rules of Professional Conduct. It relied on the ABA's Standards for Imposing Lawyer Sanctions[6] to conclude the baseline sanction is disbarment. It recognized vulnerability of the victims as the only aggravating factor. As to mitigating factors, the committee noted absence of a prior disciplinary record, timely good faith effort to make restitution or rectify consequences of misconduct, full and free disclosure to the disciplinary board or cooperative attitude toward proceedings, good character and reputation, imposition of other penalties or sanctions, remorse, interim rehabilitation and the delay in the disciplinary proceedings.
Relying on the jurisprudence and the overwhelming letters of support from prosecutors and other character witnesses, the committee deviated downward from the baseline sanction of disbarment to recommend a thirty-month suspension, retroactive to the date of respondent's interim suspension.

Disciplinary Board Recommendation
The disciplinary board concurred in the findings of the hearing committee relative to the professional violations. It noted respondent knowingly, if not intentionally, violated duties owed to the public. As to the substantial injury, the board recognized the assets of three insurance companies were depleted and scores of policyholders were injured. The board also adopted the aggravating and mitigating factors cited by the committee, as well as concurred disbarment is the baseline sanction. Thus, it determined the only issue for its consideration was whether the mitigating factors presented warranted a downward departure from the sanction of disbarment.
In finding a lengthy suspension to be more appropriate, the board relied on the letters in the record attesting to respondent's good character. It also found it significant that the federal judge who sentenced respondent in connection with criminal case departed downward from the sentencing guidelines, based on respondent's cooperation with the government. Considering these factors, the board recommended respondent be suspended from the practice of law for a period of three years.
The ODC filed an objection to the leniency of the proposed sanction. By operation of Supreme Court Rule XIX, § 11(G), the case was docketed for briefing and argument.

*415 DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const. art. V, § 5(B). When the disciplinary proceeding involves an attorney who has been convicted of a crime, the sole issue to be decided by this court is whether the crime warrants discipline, and, if so, the extent thereof. Supreme Court Rule XIX, § 19(E); Louisiana State Bar Ass'n v. Garraway, 520 So.2d 400 (La.1988). The criminal conviction is conclusive evidence of guilt and the discipline to be imposed depends on the seriousness of the offense and the extent of aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Perez, 550 So.2d 188 (La.1989).
It is uncontested by respondent that the crime of which he was convicted, conspiracy to defraud insurance companies and their investors in violation of 18 U.S.C. § 371, is a serious crime that involves elements of fraud and moral turpitude. Standard 5.11 of the ABA's Standards for Imposing Lawyer Sanctions[7] suggests that the baseline sanction for such misconduct is disbarment. However, respondent asks us to depart from that baseline sanction by considering the numerous mitigating factors in this case.
We recognize the presence of mitigating factors found by the disciplinary board. Additionally, the record is replete with evidence of respondent's cooperation in the underlying criminal investigation, for which he received substantial benefit in the federal criminal proceeding.[8]
Nonetheless, these mitigating factors cannot cause us to ignore the magnitude of the harm that resulted from respondent's use of his legal skills to further this crime. See Louisiana State Bar Ass'n v. Hennigan, 340 So.2d 264, 269 (La.1976) (the presence of mitigating circumstances "do not detract from the fact that the crime relates directly to a flagrant abuse of respondent's skills as an attorney"). While respondent was not the principal actor in the underlying insurance fraud scheme, his participation in the scheme was essential in order for it to work. He used his skills as an attorney to deceive insurance regulators, policyholders and investors. The end result of this fraud, of which respondent was an integral part, was the loss of millions of dollars by citizens in the state and around the country.
In disciplinary proceedings involving an attorney's conviction of a crime involving elements of fraud, especially in connection with an organized scheme, this court has not hesitated to impose disbarment. See In re: Schneider, 97-2457 (La.1/30/98), 707 So.2d 38 (attorney convicted of mail fraud, conspiracy to commit mail fraud, intentionally submitting false statements to a banking institution, and tax fraud was disbarred from the practice of law); In re: Naccari, 97-1546 (La.12/19/97), 705 So.2d 734 (attorney and former judge convicted of wire fraud in insurance scheme was disbarred from practicing law); In re: King, 94-0686 (La.11/30/94), 646 So.2d 326 (attorney convicted of aiding and abetting mail fraud was disbarred from the practice of law). As in those cases, disbarment is *416 the only appropriate sanction under these facts.
Accordingly, we must disbar respondent from the practice of law in the State of Louisiana.

DECREE
Upon review of the findings and recommendation of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that the name of Jerry F. Palmer be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
NOTES
[1] 18 U.S.C. § 371, entitled "Conspiracy to Commit Offense or to Defraud United States" provides:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.
[2] The Factual Basis filed in connection with the criminal proceedings alleged:

[Respondent], along with his co-conspirators, were involved in a conspiracy created and masterminded by other co-conspirators to defraud certain companies ... and their investors, policyholders, and claimants. As a part of the conspiracy, false financial and advertising information about the insurance companies was disbursed to the public and to regulatory agencies. This information concealed the fraudulent activities of the co-conspirators, concealed the financial problems of the companies, deceived current investors and policyholders so that they would not withdraw their investments, and enticed new investors and policyholders to invest their funds.
[3] The trial judge substantially deviated downward from the sentencing guidelines. The guidelines provided the following ranges for the offense: sixty months imprisonment, two to three years supervised release, $12,500-$125,000 fine, $72,348,763 in restitution and a $50 special assessment.
[4] Prior to that time, he had been expressly prohibited under the terms of the sealed bill of information and plea from reporting his misconduct and disclosing the existence of his plea to disciplinary authorities due to the potentially detrimental effect on the federal government's case.
[5] Harry McSherry, Assistant United States Attorney for the Eastern District of Louisiana, wrote of the benefit of his ten-year relationship with respondent stemming from the lengthy, successful prosecution of the holding company of Mr. Schamburger and Mr. Jackson. He stated that "... few witnesses had to endure such a lengthy period [10 years] where they were called upon to repeatedly satisfy their cooperation obligations." He further alleged respondent "... stands out as an exception among the many attorney-defendants [he] encountered ... both in regard to his extraordinarily willingness to accept responsibility and his cooperation with law enforcement."

Barry W. Karns, the Louisiana Department of Insurance's Court Appointed Receiver for one of Bomar's failed insurance carriers, wrote that respondent provided valuable assistance to obtain as many assets as possible for the failed insurance company. He further alleged "... the amount of time which [respondent] spent in assisting [his] office and the quality of [respondent's] assistance has surpassed that provided by any other former officer, director, or owner of a failed insurance company."
Mr. Beard, Deputy U.S. Attorney for the Northern District of Florida, wrote he had never met an individual that deserved more consideration at the time of sentencing than respondent based on his cooperation and efforts to correct the harm he caused.
[6] Standard 5.11 provides disbarment is generally appropriate when a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft.
[7] Standard 5.11(a) provides that disbarment is generally appropriate when "a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft...."
[8] However, it is noteworthy that respondent cooperated only after the scheme was uncovered by the authorities.