*442 ATTORNEY DISCIPLINARY PROCEEDINGS
JjPER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Lawrence A. Mann, an attorney licensed to practice law in Louisiana but currently on interim suspension.[1]
UNDERLYING FACTS
During all times pertinent to these proceedings, respondent was a partner in the New Orleans law firm of Leake, Anders-son & Mann, where his practice was concentrated primarily in the area of insurance defense. In 1996 or 1997, respondent and his law firm acquired a new client, ATC Leasing Company (“ATC”), a self-insured trucking company headquartered in Kenosha, Wisconsin. The company was referred to the firm by its claims manager, Bruce Bennett, with whom respondent has been friends for the last eleven years. In the fall of 2000, Mr. Bennett told respondent that he needed assistance and was in fear for his life because his gambling was out of control. Respondent’s agreement to help Mr. Bennett led to his participation in four separate schemes involving ATC’s settlement of fraudulent personal injury claims and payment for legal services that were not rendered. These payments totaled approximately $96,000, which was shared by respondent with Mr. Bennett and|2another participant in the scheme, all without the knowledge or consent of respondent’s law firm or his client, ATC.

The Regional Counsel Scheme

Mr. Bennett suggested that respondent become “regional counsel” for ATC, with the understanding that checks for attorney’s fees would be sent to respondent at his home (bypassing the Leake, Andersson & Mann law firm), deposited into his personal bank account, and then “kicked back” to Mr. Bennett. Respondent agreed to this scheme, and on Mr. Bennett’s instructions, ATC paid respondent a total of $35,000 for serving as “regional counsel.” While respondent would occasionally offer Mr. Bennett legal advice or perform some services as “regional counsel,” the work he performed did not justify the $35,000 in fees paid to him by ATC. From these funds, respondent retained between $20,000 and $22,000 to cover any tax liability; he “kicked back” the balance to Mr. Bennett.

The Shannon Williams Claim

In November 2000, Mr. Bennett assigned respondent to investigate and defend the personal injury claim of Shannon Williams, stemming from an accident involving an ATC driver. After the file was opened, respondent determined that no suit was filed on behalf of Ms. Williams within one year of the date of the accident, and accordingly, he informed Mr. Bennett that Ms. Williams’ personal injury claim was prescribed and that ATC had no exposure under Louisiana law. Nevertheless, Mr. Bennett proposed and respondent agreed to proceed as though Ms. Williams had a viable pending tort claim, so as to create an additional source of funds to be paid by ATC and “kicked back” to Mr. Bennett. Respondent subsequently “settled” Ms. IsWilliams’ fictitious claim for $39,000, created bogus correspondence, pleadings, and settlement documents to support the “file,” and obtained a “settle *443 ment” check from Mr. Bennett drawn on the account of ATC. The check was delivered to Fritz Stoller,[2] a New Orleans defense attorney whom respondent recruited to act as “counsel” for Ms. Williams. In December 2000, Mr. Stoller deposited the check into his “client trust account.”

The Medical Lienholder Claim

Respondent successfully settled a legitimate tort claim against ATC for $10,000 less than the reserve established by Mr. Bennett. Thereafter, Mr. Bennett proposed and respondent agreed that the excess reserve would serve as an additional source of funds to be “kicked back” to Mr. Bennett. Respondent again enlisted Mr. Stoller’s aid, this time to pose as counsel for a fictitious medical lienholder. On Mr. Bennett’s instructions, ATC paid the sum of $10,000 to Mr. Stoller through respondent in order to satisfy the “lien.” In January 2001, Mr. Stoller deposited the check into his “client trust account.”
The proceeds of the checks issued by ATC in connection with the Shannon Williams claim and the medical lienholder claim were shared by Mr. Bennett, Mr. Stoller, and respondent. Out of the total of $49,000 paid by ATC in those matters, Mr. Stoller retained approximately $20,000; he paid the $29,000 balance to respondent, who in turn “kicked back” an undetermined amount to Mr. Bennett.
| ¿The “Girlfriend” Claim
In January 2001, Mr. Bennett authorized a $12,000 “settlement” of a fictitious claim against ATC. Respondent provided Mr. Bennett with the name of his girlfriend to be used as the claimant in the case. Mr. Bennett forwarded the “settlement” check to respondent, who kept approximately $4,000 for himself. Respondent “kicked back” the balance to Mr. Bennett.
These matters, as well as other similar matters involving Mr. Bennett,[3] ultimately came to the attention of federal authorities. In January 2002, after respondent learned that he was the subject of a federal investigation, he self-reported his misconduct to the ODC. On March 4, 2002, the United States Attorney for the Eastern District of Wisconsin filed a single count bill of information charging respondent with a violation of 18 U.S.C. §§ 2 and 2314, the interstate transportation of a security obtained by fraud.[4] Respondent pleaded guilty to the charge, which is a felony under federal law.
On September 20, 2002, the district court sentenced respondent to serve five months in a halfway house, followed by three years of supervised release, five *444 months of which were to be served in home confinement with electronic monitoring. Respondent was ordered to perform a total of 90 hours of community service in lieu |fiof a fine. On the day of sentencing, respondent, together with Mr. Stoller, paid $96,275 in restitution to ATC in accordance with the plea agreement each entered into with the Government.
DISCIPLINARY PROCEEDINGS
On June 19, 2002, the ODC filed one count of formal charges against respondent, alleging that his conduct constituted a violation of Rules 8.4(a) (violation of the Rules of Professional Conduct), 8.4(b) (commission of a criminal act reflecting adversely on the lawyer’s honesty, trustworthiness, or fitness as a lawyer), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct. Respondent answered the formal charges and admitted his misconduct, but requested a hearing in mitigation.

Formal Hearing

When this matter proceeded to a formal hearing on April 16, 2003, the ODC introduced documentary evidence in support of the formal charges, including the bill of information against respondent, the plea agreement between respondent and the Government, and the district court’s judgment in the criminal case. The ODC also introduced the bogus defense file that respondent created in connection with the Shannon Williams scheme, the deposition of Mr. Bennett, and the bank records of Mr. Stoller’s “client trust account.”
Respondent stipulated to the introduction of the ODC’s exhibits and introduced the transcript of the sentencing hearing in his criminal case. Respondent also introduced testimony concerning his good character and reputation in the community. In his own testimony, respondent admitted that his conduct was wrong and “pretty | fistupid,” but suggested that he was not trying to enrich himself by agreeing to help Mr. Bennett. Rather, respondent testified that his only motivation was concern for his friend, whom he honestly believed “was in danger of some bodily harm or problems with his life and he was calling out to me.”

Hearing Committee Recommendation

The hearing committee’s findings of fact, based upon the evidence and testimony presented at the hearing, include the following: [5]
1. Respondent’s conduct in all respects was knowing and intentional.
2. The actual injury caused by respondent’s conduct can be quantified at or about $96,000 ($35,000 in “regional counsel” fees, plus $39,000 for the Williams “settlement,” plus $10,000 for the medical lienholder “settlement,” plus $12,000 for the “settlement” check endorsed by respondent’s girlfriend).
3. Respondent’s failure to disclose to his client its employee’s fraudulent and criminal conduct caused ATC Leasing to suffer a total loss at the hands of Bennett amounting to nearly $740,000.
4. Respondent contends that he acted out of concern for the safety of a friend and not out of greed. However, respondent does not dispute that he retained a portion of the funds that came through his hands as a result of his dealings with Bennett.
Based on these factual findings, the committee concluded that respondent violated *445 Rules 8.4(a), 8.4(b), and 8.4(c) of the Rules of Professional Conduct, as charged in the formal charges.
|7The committee determined that respondent violated duties owed to his client, the public, and as a professional. Respondent’s misconduct was knowing and intentional and caused substantial harm to his client. Under the ABA’s Standards for Imposing Lawyer Sanctions, the baseline sanction for respondent’s conduct is disbarment.
As aggravating factors, the committee recognized respondent’s dishonest or selfish motive, a pattern of misconduct, multiple offenses, vulnerability of the victim, and substantial experience in the practice of law (admitted 1981). In mitigation, the committee acknowledged the absence of a prior disciplinary record, full and free disclosure to the ODC, character and reputation, and remorse. The committee found that respondent’s payment of restitution to ATC was forced or compelled, and thus was neither an aggravating nor a mitigating circumstance.
In light of the seriousness of respondent’s conduct, and considering the permanent disbarment guidelines set forth in Appendix E to the Rules of Lawyer Disciplinary Enforcement, the committee recommended that respondent be permanently disbarred.
Respondent filed an objection to the sanction recommended by the hearing committee, contending that permanent disbarment is too harsh and that no more than a three-year suspension should be imposed given the mitigating factors present in this case.

Disciplinary Board Recommendation

After reviewing the record, the disciplinary board concurred in the hearing committee’s factual findings and its application of the Rules of Professional | ¡¡Conduct.[6] Likewise, the board agreed with the committee that respondent engaged in multiple instances of intentional conversion of client funds with substantial harm to the client, and pleaded guilty to serious criminal conduct involving misrepresentation, fraud, misappropriation, and theft. Respondent’s conduct violated duties owed to his client, the public, and as a professional. The board also agreed that disbarment is the baseline sanction for respondent’s misconduct.
The board adopted the aggravating and mitigating factors found by the committee. In addition, the board found the record supports the mitigating factor of the imposition of other penalties or sanctions, in the form of the sentence imposed in respondent’s criminal case.
Turning to the issue of an appropriate sanction, the board rejected respondent’s argument that the mitigating factors present justify the imposition of a sanction less than permanent disbarment. The board found respondent’s conduct is serious and fits within Guideline 1 of the permanent disbarment guidelines (“repeated or multiple instances of intentional conversion of client funds with substantial harm”), as well as Guideline 6 (insurance fraud). The board noted that respondent engaged in calculated and dishonest conduct by engaging in multiple instances of intentional conversion of client funds, which resulted in substantial harm to his client. Furthermore, respondent participated in a scheme to defraud ATC by having the company *446 pay non-existent or non-viable claims for damages. Although ATC was self-insured, the board found that “insurance fraud” is a broad concept, and accordingly, determined Guideline 6 is applicable to respondent’s misconduct.
[ nBased on this reasoning, the board recommended respondent be permanently disbarred. The board also recommended that respondent be assessed with all costs and expenses of these proceedings.
Neither respondent nor the ODC filed an objection in this court to the disciplinary board’s recommendation.
DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const, art. V, § 5(B). When the disciplinary proceedings involve an attorney who has been convicted of a crime, the conviction is conclusive evidence of guilt and the sole issue presented is whether respondent’s crimes warrant discipline, and if so, the extent thereof. Supreme Court Rule XIX, § 19(E); In re: Boudreau, 02-0007 (La.4/12/02), 815 So.2d 76; Louisiana State Bar Ass’n v. Wilkinson, 562 So.2d 902 (La.1990). The discipline to be imposed depends on the seriousness of the offense and the extent of the aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Perez, 550 So.2d 188 (La.1989).
In the instant case, respondent stands convicted of one count of the interstate transportation of a check obtained by fraud. Respondent’s conduct is both criminal and unethical, and clearly warrants serious discipline. The only issue that we must resolve is the appropriate sanction to be imposed.
We recognize that several mitigating factors are supported by the record, including the absence of a prior disciplinary record, character and reputation, imposition of other penalties or sanctions, and remorse. Respondent has also demonstrated a cooperative attitude toward the disciplinary proceedings. Nevertheless, these mitigating factors do not diminish either the egregious nature of | inthe conduct at issue or the substantial actual harm that results to the integrity of the profession whenever a lawyer is convicted of a serious crime.
Respondent has admitted that he planned and entered into a scheme with Mr. Bennett to obtain payment of fraudulent tort claims. Respondent recruited another attorney, Fritz Stoller, to assist in negotiating the fraudulent claim checks by posing as counsel for fictitious clients. Respondent also received payment for legal services he had purportedly rendered to his client, ATC Leasing Company, when in fact, he had not provided the legal services and was not entitled to the payment. Respondent’s client lost approximately $96,000 as a direct result of the fraudulent schemes perpetrated by respondent and Mr. Bennett. It is particularly disturbing that respondent used his skills as an attorney to facilitate the commission and concealment of these schemes, going so far as to manufacture a defense file in connection with the “settlement” of the prescribed Shannon Williams claim.
Under these circumstances, disbarment is clearly appropriate. However, in their respective reports, the hearing committee and the disciplinary board have concluded that respondent’s offenses are so egregious that he should be permanently prohibited from applying for readmission to the bar.
We agree. In Appendix E to Supreme Court Rule XIX, we set forth guidelines illustrating the types of conduct which might warrant permanent disbarment. While these guidelines are not intended to bind this court in its decision-making pro *447 cess, they present useful information concerning the types of conduct we might consider worthy of permanent disbarment. For purposes of the instant case, Guidelines 1 and 6 are relevant. Those guidelines provide:
_|jjGUIDELINE 1. Repeated or multiple instances of intentional conversion of client funds with substantial harm.
GUIDELINE 6. Insurance fraud, including but not limited to staged accidents or widespread runner-based solicitation.
While the misconduct at issue here is different from the kinds of conversion typically seen by this court, Guideline 1 is nonetheless applicable. Much like the lawyer who pockets his client’s settlement funds or steals money earmarked for a medical provider, the fraudulent schemes in which respondent participated resulted in a conversion of funds to the detriment of his client. Guideline 6 is also implicated, as the undisputed evidence shows respondent manufactured fraudulent personal injury claims in an attempt to defraud ATC. This conduct is precisely the type of reprehensible conduct we sought to address in Guideline 6.
Under the circumstances of this case, the imposition of any sanction less than permanent disbarment would require us to ignore the seriousness of respondent’s conduct and the grave harm he has visited upon his client and the legal profession. We will therefore accept the disciplinary board’s recommendation and permanently disbar respondent.
DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, it is ordered that that the name of Lawrence A. Mann, Louisiana Bar Roll number 9096, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. |1%A11 costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.

. In re: Mann, 02-0239 (La.2/6/02), 807 So.2d 828.

. Respondent and Mr. Stoller had at one point in time worked together in the same law firm. Like respondent, Mr. Stoller has faced both federal criminal charges and disciplinary proceedings arising out of his participation in the scheme. Mr. Stoller is presently on interim suspension. See In re: Stoller, 02-1131 (La.5/8/02), 816 So.2d 848.

. ATC suffered a total loss at the hands of Mr. Bennett amounting to nearly three-quarters of a million dollars. Mr. Bennett ultimately pleaded guilty to charges of bank fraud and the interstate transportation of a security obtained by fraud. He was sentenced to serve 37 months in federal prison.

.The following are the elements of the offense of the interstate transportation of a security obtained by fraud:
1. That the check in question was obtained by fraud.
2. That the check had a value of at least $5,000.
3. That respondent caused the check to be transmitted or transferred in interstate commerce, in this case from Wisconsin to Louisiana.
4. That at the time respondent transmitted or transferred the check, or caused it to be transmitted or transferred, he knew it had been obtained by fraud.

. The hearing committee made 38 specific factual findings, 37 of which were not disputed by respondent or the ODC. The undisputed facts are incorporated into the "underlying facts” section of this opinion.

. The board’s report contains a lengthy discussion of why the hearing committee correctly found that respondent did not violate Rule 8.4(d) (engaging in conduct prejudicial to the administration of justice) "as charged” in the formal charges. However, Rule 8.4(d) is mentioned nowhere in the formal charges filed against respondent.