JjPER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Fritz M. Stoller, an attorney licensed to practice law in Louisiana but currently on interim suspension.[1]
UNDERLYING FACTS
In November 2000, a Wisconsin-based trucking company retained attorney Lawrence Mann to defend a personal injury claim by Shannon Williams. Although the claim was prescribed, Mr. Mann and the claims manager for the trucking company agreed to proceed as though Ms. Williams had a viable pending tort claim. Thereafter Mr. Mann enlisted respondent’s assistance to pose as “counsel” for Ms. Williams and receive and disburse the “settlement” funds. Respondent agreed to do so.
In order to effectuate the scheme, respondent opened a “client trust account” in his name on November 30, 2000. In early December 2000, Mr. Mann forwarded respondent a $39,000 check issued by the trucking company in “settlement” of Ms. Williams’ claim. Respondent endorsed the check[2] and deposited it into his “client trust account” on December 7, 2000.
bin approximately the same time frame as the Shannon Williams matter, Mr. Mann successfully settled a legitimate tort claim against the trucking company for $10,000 less than the reserve established by the company. Thereafter Mr. Mann enlisted respondent’s assistance to pose as “counsel” for a fictitious medical lienholder to whom the $10,000 was purportedly owed. Respondent agreed to do so. In January 2001, Mr. Mann forwarded respondent a check in the amount of $10,000 to satisfy the “lien.” Respondent endorsed the check and deposited it into his “client trust account” on January 26, 2001.
The proceeds of the checks issued by the trucking company in connection with the Shannon Williams claim and the medi *983 cal lienholder claim were shared by respondent and Mr. Mann, all without the knowledge or consent of the trucking company.[3] Out of the total of $49,000 paid in those two matters and deposited into respondent’s “client trust account,” respondent wrote eight separate checks payable to himself totaling $20,000. Respondent disbursed the remainder of the funds to Mr. Mann.[4]
|sThe scheme ultimately came to the attention of federal authorities. On July 12, 2002, the United States Attorney filed a one-count bill of information charging respondent with a violation of 18 U.S.C. §§ 2 and 2314, the interstate transportation of a security obtained by fraud.[5] Respondent pleaded guilty in the Eastern District of Wisconsin to the charge set forth in the bill of information, which is a felony under federal law. On January 10, 2003, the district court placed respondent on probation for a term of six months with home confinement and imposed a $3,500 fine.[6]
DISCIPLINARY PROCEEDINGS
On July 11, 2003, the ODC filed one count of formal charges against respondent, alleging that his conduct constituted a violation of Rules 8.4(a) (violation of the Rules of Professional Conduct), 8.4(b) (commission of a criminal act reflecting adversely on the lawyer’s honesty, trustworthiness, or fitness as a lawyer), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct. Respondent answered the formal charges and admitted his conviction, but requested a hearing in mitigation.

Formal Hearing

This matter proceeded to a hearing before the hearing committee. The ODC submitted documentary evidence in support of the formal charges, including pleadings from the criminal case, the bank records relating to the “client trust *984 | ¿account’’ opened by respondent, a transcript of a March 7, 2002 sworn statement given by respondent, and a fraudulent defense file that Mr. Mann created in connection with the Shannon Williams scheme.
Respondent introduced medical reports and testimony indicating that he was diagnosed with Parkinson’s disease and depression in early 2000. Respondent’s treating psychiatrist, James G. Barbee, M.D., testified on direct examination that respondent’s medical conditions, the side effects of the numerous prescription medications he takes, and events in his family life merged together in 2000 to alter his impulse control and the degree to which he analyzed problems in depth, both of which are key aspects of thinking. Dr. Barbee also opined that during this period respondent would accede to helping a friend who asked him for a favor — even if it involved questionable conduct — because respondent’s guard was lowered and his risk control mechanisms had been reduced. On cross-examination, however, Dr. Bar-bee admitted that he never felt respondent’s judgment was so impaired that he should quit practicing law altogether, nor did he feel that respondent represented a threat of harm to the public in 2000 and 2001. Dr. Barbee also admitted that he was unaware of any other occasions in respondent’s law practice when conduct occurred that was similar to that involving Mr. Mann. When asked whether respondent’s conduct involving Mr. Mann “can. be explained away” by the “confluence of events,” as respondent suggested, Dr. Bar-bee conceded that respondent’s numerous actions over a one-year period in furtherance of the fraudulent scheme make that claim “a stretch.”
In his own testimony before the committee, respondent explained that Mr. Mann, his friend of some twenty years, contacted him in the fall of 2000 and asked him to cash a check for a friend of his who was in trouble. Respondent agreed to do so without making any further inquiries of Mr. Mann. Respondent subsequently Ropened a trust account and deposited the $39,000 and $10,000 checks from the trucking company into it, even though he did not represent the clients for whom the checks were intended. He then disbursed the funds as he was instructed to do by Mr. Mann, including a total of $20,000 in checks respondent made payable to himself and deposited into his personal checking account. Respondent explained that this was a “hard time” for him, during which he was having problems in his personal life, complicated by Parkinson’s and depression. Nevertheless, respondent conceded that he knew right from wrong during this time.

Hearing Committee Recommendation

Following the hearing, the hearing committee issued its report. The committee rejected respondent’s contention that his judgment was impaired by his medical condition during the time frame at issue and instead found respondent’s conduct in all respects was intentional. In support, the committee observed that respondent’s psychiatrist acknowledged that respondent’s misconduct was not directly caused by Parkinson’s disease or depression. Additionally, it pointed out respondent’s admission that he knew right from wrong and that the influence of medication and his Parkinson’s disease did not cause him to lose his sense of right and wrong.
The committee found respondent’s misconduct was the result of his “wanting to help a friend.” Nonetheless, the committee found respondent’s actions were not altruistic, as he did not dispute that he retained a portion of the funds that came through his hands as a result of Ms dealings with Mr. Mann.
*985 The committee quantified the monetary-harm caused by respondent at or about $49,000, consisting of the $39,000 fraudulent settlement in the Williams matter and the $10,000 fraudulent settlement in the medical lienholder matter. Further, by failing | fito disclose the scheme to the proper authorities, the committee found that respondent contributed to the $740,000 total loss suffered by the trucking company as a result of the activities of Mr. Mann and its claims manager. In addition to the monetary losses, the committee determined respondent’s activities harmed the legal profession by causing the public to lose confidence in the justice system. Based on these factual findings, the committee concluded that respondent violated Rules 8.4(a), 8.4(b), and 8.4(c) of the Rules of Professional Conduct, as charged in the formal charges.
The committee found respondent’s misconduct was intentional and caused substantial harm to Mr. Mann’s client. Under the ABA’s Standards for Imposing Lawyer Sanctions, the baseline sanction for respondent’s conduct is disbarment.
As aggravating factors, the committee recognized respondent’s dishonest or selfish motive, a pattern of misconduct, multiple offenses, vulnerability of the victim, and substantial experience in the practice of law (admitted 1978). In mitigation, the committee acknowledged the absence of a prior disciplinary record, personal or emotional problems, full and free disclosure to the ODC, character and reputation, and remorse. The committee found that respondent’s payment of restitution was forced or compelled, and thus was neither an aggravating nor a mitigating circumstance.
As earlier noted, the committee expressly rejected any causal connection between respondent’s misconduct and his physical disability, depression, and medications. The committee acknowledged that respondent suffers from both Parkinson’s disease and depression, and that he has taken numerous medications for these conditions; however, respondent admitted that at all times he knew right from wrong and that he engaged in the misconduct because he was asked to do so by Mr. Mann. The committee also felt that respondent’s depression was under control by | November 2000, prior to the occurrence of most of his fraudulent actions.[7] Finally, the committee found that respondent had demonstrated no other problems in satisfying the obligations of his law practice; his former law partner testified that he did not notice any change in the way respondent handled clients’ cases or anything different about the way respondent practiced law diming the time that he was involved in the fraudulent scheme with Mr. Mann. Based on this reasoning, the committee concluded that respondent failed to establish the requisite causal connection between his disability and the misconduct:
As Disciplinary'Counsel correctly points out, there were 19 separate acts involved in the fraudulent scheme to defraud between Lawrence Mann and Respondent beginning in November, 2000 and ending in November,. 2001. Seventeen of these specific acts, which included Respondent fraudulently obtaining funds for himself occurred after November, 2000 when his depression was under control. In addition, his ex-law partner, William Lan- *986 genstein testified that no other area of Respondent’s work in their firm was affected by Respondent’s diagnosis of Parkinson’s disease or by his depression. Accordingly, this Hearing Committee finds that the evidence overwhelmingly proves that Respondent’s misconduct was motivated by his particular relationship with his friend Lawrence Mann and was not affected in any substantial way by his diagnosis of Parkinson’s disease or his subsequent depression and treatment.
The Hearing Committee also notes that when Respondent pled guilty, Respondent admitted that he knew at the time that he intentionally agreed to the scheme suggested by Lawrence Mann, i.e., that he would aid and abet the transportation of securities taken by fraud. Any testimony by Respondent to the contrary is not credible in as much as it is “inconsistent with the essential elements of the crime for which he was convicted.” [emphasis added]
I sUnder these facts, the committee considered the sanction of permanent disbarment, but ultimately declined to recommend that sanction “only because of Respondent’s pxior spotless record as an attorney and his prior reputation and character as evidenced by the testimony of ... judges and members of the bar.” Rather, the committee recommended that respondent be disbarred.
Both respondent and the ODC filed objections to the hearing committee’s recommendation. The ODC objected to the leniency of the sanction recommended by the committee, urging that permanent disbarment is appropriate. Respondent objected to nearly the entirety of the committee’s report, including its factual findings and its application of the aggravating and mitigating factors. Respondent also argued that the sanction recommended by the committee is too harsh, and that no more than a three-year suspension should be imposed in this case.

Disciplinary Board Recommendation

After reviewing the record, the disciplinary board accepted a majority of the hearing committee’s factual findings, and agreed that respondent violated Rules 8.4(a), 8.4(b), and 8.4(c) of the Rules of Professional Conduct. Likewise, the board agreed with the committee that respondent assisted Mr. Mann in multiple instances of intentional conversion of Mr. Mann’s client’s funds, causing substantial harm to the client. Respondent engaged in and pleaded guilty to serious criminal conduct involving misrepresentation, fraud, misappropriation, and theft. Respondent’s conduct was intentional and violated duties owed to the public, the legal system, and as a professional. The board also agreed that disbarment is the baseline sanction for respondent’s misconduct.
| ciThe board adopted the aggravating and mitigating factors found by the committee. In particular, the board commended the well-reasoned analysis of the committee in finding there is no causal connection between respondent’s disability (Parkinson’s disease, depression, and medications) and the misconduct that he committed. Furthermore, noting that the restitution paid by respondent was mandatory under his plea agreement with the Government, the board agreed with the committee that restitution was forced or compelled and thus was neither an aggravating nor a mitigating circumstance.
Turning to the issue of an appropriate sanction, the board found respondent’s conduct fits within Guideline 6 (insurance fraud) of the permanent disbarment guidelines. In support, the board observed that respondent participated in a scheme to defraud the self-insured trucking company by having the company pay non-existent or *987 non-viable claims for damages. In light of this “calculated and dishonest conduct,” the board found that “the mitigating factors present here do not justify the imposition of a sanction less than permanent disbarment.” Accordingly, the board recommended respondent be permanently disbarred. The board also recommended that respondent be assessed with all costs and expenses of these proceedings.
Respondent filed an objection to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const. art. V, § 5(B). When the disciplinary proceedings involve an attorney who has been convicted of a crime, the conviction is conclusive evidence of guilt and the sole |inissue presented is whether the respondent’s crimes warrant discipline, and if so, the extent thereof. At the hearing before a hearing committee the respondent may offer evidence only of mitigating circumstances not inconsistent with the essential elements of the crime of which he was convicted, as determined by the statute defining the crime. Supreme Court Rule XIX, § 19(E); In re: Boudreau, 02-0007 (La.4/12/02), 815 So.2d 76; Louisiana State Bar Ass’n v. Wilkinson, 562 So.2d 902 (La.1990). These standards are clearly designed to put an end to an examination of the respondent’s guilt or innocence of the crime of which he has already been convicted and to permit only the introduction of mitigating circumstances that are not inconsistent with that guilt. Louisiana State Bar Ass’n v. Loridans, 338 So.2d 1338, 1344 (La.1976).[8] This relates solely to circumstances which bear upon the appropriate measure of discipline to be imposed. Id. at 1345.
In the instant case, respondent was convicted of one count of the interstate transportation of a check obtained by fraud, a felony under federal law. This crime is clearly a “serious crime” for purposes of Supreme Court Rule XIX, § 19(B) and warrants professional discipline. Therefore, the sole issue before us is the appropriate discipline to be imposed. The resolution of that issue depends upon the seriousness of the offense, the circumstances of the offense, and the extent of the aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Perez, 550 So.2d 188 (La.1989).
In brief and argument to this court, respondent focuses in large measure on the weight in mitigation to be assigned to his Parkinson’s disease, depression, and the Ineffects of his medication,[9] which he maintains negatively impacted- his judgment during the time frame at issue. According to respondent, his “ethical and moral compass, which had served him well in the community for three decades, was misaligned due to medical causes, as the medical testimony corroborated.”
*988 In essence, respondent argues that his condition constitutes a mental disability. In order to prove the mitigating factor of mental disability, ABA Standard 9.32(f) provides the lawyer must prove the following four factors by clear and convincing evidence:
(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
(2) the chemical dependency or mental disability caused the misconduct;
(3) the respondent’s recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.
The commentary to Standard 9.32 emphasizes the “careful analysis” that is required in considering issues of mental disability offered as mitigating factors in disciplinary proceedings, and that “direct causation between the disability” and the misconduct must be established. The commentary further discusses the weight to be assigned to this factor, indicating that “the greatest weight” should be assigned when the disability is the sole cause of the offense. If the disability is the principal cause of the offense, it should be given “very great weight”; if it is a substantial contributing cause of the offense, it should be given “great weight.” In all other cases in which the 1 ^disability is considered as mitigating, the commentary indicates it should be given “little weight.”
In the instant case, the hearing committee made a finding that respondent failed to satisfy the second element of this test, as he was unable to establish any causal link between his misconduct and the mental disability. Our careful review of the record demonstrates the committee’s finding is not clearly wrong.
Respondent’s position that his medical condition was responsible for his ethical lapse might be tenable if his misconduct consisted of an isolated act. It does not. Rather, a review of the record demonstrates that respondent’s actions involved a complex and interlocking series of actions which occurred over a period of one year. After agreeing to Mr. Mann’s proposal, respondent opened a client trust account at a bank he did not regularly use in November 2000. In December 2000, respondent endorsed and deposited a $39,000 settlement check, made payable to a client whom he had never met and never represented, into this account. In January 2001, respondent posed as counsel for a fictitious medical lienholder, endorsing and depositing into his trust account a $10,000 check made payable to this entity. From December 2000 through November 2001, respondent wrote fourteen separate checks — eight of which were payable to himself — from the client trust account to disburse the funds obtained by fraud.
Respondent’s repeated and deliberate actions over this lengthy period of time belie his contention that his misconduct was an aberration. Indeed, respondent’s own treating psychiatrist conceded that it would be a “stretch” to attribute all of these actions to respondent’s medical condition. Considering the record as a whole, we must conclude there is no causal connection between respondent’s misconduct and lijjhis medical condition. As a result, respondent has failed to prove that the mitigating factor of mental disability is applicable.
Alternatively, respondent suggests that his medical condition may be considered as a personal or emotional problem under ABA Standard 9.32(c). Our review of the jurisprudence indicates that there is *989 no requirement that there must be a causal nexus between the misconduct and the personal or emotional problem in order for the factor to be recognized in mitigation. Nonetheless, it would be an exercise in absurdity if we were to hold that a medical condition which does not satisfy the requirements to be considered in mitigation as a mental disability could be entitled to the same weight if simply re-labeled as a personal and emotional problem. Thus, while we accept respondent’s medical condition as a personal or emotional problem, we determine it carries very little weight in mitigation.[10]
Other mitigating factors present are respondent’s lack of a prior disciplinary record, his family problems during the time in question, his cooperative attitude toward these proceedings, his reputation for good character, and his demonstration of remorse. Additionally, he received other penalties or sanctions for his conduct in the criminal case, in the form of a fine and a six-month period of home incarceration. Balanced against these mitigating factors are several significant aggravating factors: respondent’s dishonest or selfish motive, a pattern of misconduct, multiple offenses, vulnerability of the victim, and substantial experience in the practice of law.
In the final analysis, respondent’s actions speak for themselves. Respondent assisted Mr. Mann in a fraudulent insurance scheme by posing as counsel for | ^fictitious clients and negotiating two fraudulent settlement checks.[11] He used his skill and position as an attorney to facilitate the commission and concealment of the scheme, going so far as to open a “client trust account” in which to deposit the money taken by fraud. As the hearing committee observed, respondent’s actions not only resulted in a substantial monetary loss to the victim in this case, but struck at the heart of the public’s confidence in the legal profession and the judicial system.
We have found certain kinds of professional misconduct to be so reprehensible as to require that the offending attorney be permanently barred from practicing law in this state. We set forth some examples of such misconduct in Appendix E to the Rules for Lawyer Disciplinary Enforcement. Of particular relevance to the instant case is Guideline 6, which refers to insurance fraud. Respondent’s actions, designed to fraudulently obtain funds from a self-insured entity, are encompassed by this guideline.
Under the circumstances of this case, the imposition of any sanction less than permanent disbarment would require us to ignore the seriousness of respondent’s conduct and the grave harm he has visited upon his victim and the legal profession. We will therefore accept the disciplinary board’s recommendation and permanently disbar respondent.
DECREE
Upon review of the findings and recommendations of the hearing committee and *990 disciplinary board, and considering the record, briefs, and oral argument, it is ordered that the name of Fritz M. Stoller, also known as Frederick M. Stoller, 11fiLouisiana Bar Roll number 12495, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
WEIMER, J., dissents from the sanction of permanent disbarment and would impose the sanction of disbarment and assigns reasons.
CALOGERO, C.J., dissents for reasons assigned by WEIMER, J.

. In re: Stoller, 02-1131 (La.5/8/02), 816 So.2d 848. Respondent's first name is actually Frederick.

. The $39,000 settlement check also bears an endorsement purporting to be that of Shannon Williams. Respondent has flatly denied that he endorsed the check in Ms. Williams' name or that he ever "signed any name other than my own.”

. Mr. Mann was permanently disbarred for his role in the scheme. In re: Mann, 04-1850 (La. 11/8/04), 886 So.2d 441.

. Between December 2000 and November 2001, respondent wrote fourteen checks on his “client trust account,” as follows:
Check number Payee Amount Date
100 Mann $5,000 December 20,2000
101 Mann 5,000 December 21, 2000
102 Mann 5,000 December 22,2000
103 Mann 4,000 February 5,2001
104 Respondent 4,000 February 5,2001
105 Mann 5,000 February 22, 2001
106 Mann 5,000 May 1,2001
107 Respondent 2,500 May 1, 2001
108 Respondent 2,500 May 1,2001
109 Respondent 2,000 May 31,2001
110 Respondent 1,500 May 31, 2001
111 Respondent 4,000 July 24,2001
112 Respondent 3,000 November 2001
113 Respondent 500 November 2001

. The bill of information relates only to the $39,000 check for Shannon Williams. Respondent, through counsel, provided information to the Government concerning the $10,000 check for the medical lienholder.

. Respondent agreed to pay restitution to the trucking company as part of his plea agreement with the Government; however, the district court’s judgment did not actually impose a restitution obligation upon respondent. Nevertheless, it appears that respondent did contribute approximately $49,000 towards the restitution paid to the trucking company.

. The committee acknowledged Dr. Barbee's testimony that respondent's mental state may have caused him to lack some impulse control. However, the committee concluded that "the fact that the scheme to defraud consisted of Respondent engaging in a number of specific acts over an extended period of time does not indicate an impulse control prob■lem.”

. We took great pains in Loridans to emphasize that inquiry is not foreclosed into the facts surrounding the conviction "insofar as they reflect upon the character or quality of the criminal conduct or a respondent’s degree of complicity therein." 338 So.2d at 1345.

. Respondent repeatedly indicates in his brief that he was on experimental medication, which, he implies contributed to his lapse in judgment. The record indicates that respondent received an experimental regimen of a Parkinson's drug known as Amgen. However, there is no testimony in the record whatsoever which indicates this drug played any role in the misconduct.

. Our reasoning is reinforced by the commentary to Standard 9.32, which makes it clear that even in the case of a mental disability (which requires a causal connection to the misconduct), little weight is given when the mental disability is not a principal or substantial cause of the misconduct. It follows that a personal or emotional problem which lacks any causal connection to the misconduct is entitled to even less weight.

. Although it is true that respondent was not the principal actor in the scheme, his participation was indispensable in order for it to work, as it was only through his complicity that the fraud could be accomplished. See In re: Palmer, 02-1780 (La. 12/4/02), 835 So.2d 410.