966 So.2d 537 (2007)
In re David H. BERNSTEIN.
No. 2007-B-1049.
Supreme Court of Louisiana.
October 16, 2007.
*538 Charles Bennett Plattsmier, Baton Rouge, for applicant.
Alston Law Firm, Elizabeth A. Alston, New Orleans, David Howard Bernstein, Metairie, for respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary *539 Counsel ("ODC") against respondent, David H. Bernstein, an attorney licensed to practice law in Louisiana. For the reasons that follow, we now disbar respondent.

UNDERLYING FACTS
The facts of this matter are largely undisputed. Respondent was employed by the New Orleans law firm of Lowe, Stein, Hoffman, Allweiss & Hauver ("Lowe Stein") from 1987 to 1996. On several occasions during respondent's tenure at the firm, his clients paid him directly for legal services rendered. Respondent cashed these checks and did not turn over the money to the Lowe Stein firm. To cover up his actions, respondent instructed the firm's accounting department to write off the client's bill in question. In one instance, respondent cashed a check made payable to him by a client but neglected to tell the accounting department to write off the bill. While respondent was on vacation, the firm issued a follow-up bill to the client, who called the accounting department and advised that the bill had already been paid. The accounting department requested that the client provide a copy of the check, and upon examination, it was apparent that respondent had endorsed the check and cashed it. When respondent returned from his vacation, his partners at Lowe Stein confronted him. Respondent initially denied any knowledge of the theft and blamed his secretary for making a "mistake,"[1] but after the partners told respondent they had proof he had taken the money, he admitted what he had done. Respondent was then dismissed from Lowe Stein; however, the firm took no other action against him and did not report the misconduct to the ODC.[2] The firm also agreed that it would not disclose the matter to anyone else.
After leaving Lowe Stein, respondent met with Jack Alltmont, the managing partner of the law firm of Sessions Fishman & Nathan ("Sessions Fishman"). Respondent told Mr. Alltmont that he was interested in making a move to the firm if there was an opportunity available to do so. During the discussion, Mr. Alltmont asked respondent why he was leaving Lowe Stein. Respondent did not tell Mr. Alltmont that he had been dismissed from his firm, but when Mr. Alltmont mentioned that he would be contacting Lowe Stein, respondent realized that he had little choice but to authorize Lowe Stein to discuss the details of his dismissal from the firm. Respondent did so, but not before telling Mr. Alltmont that he had only taken money from Lowe Stein on one occasion. After speaking to a partner of the Lowe Stein firm, Mr. Alltmont learned that respondent had taken the firm's money more than once. Respondent was then interviewed a second time by Mr. Alltmont and the other partners of Sessions Fishman. During the second interview, respondent assured the partners that "it would never happen again."
Respondent did not take money belonging to Sessions Fishman for several years after he first started working for the firm *540 in 1996. However, in 2001, respondent began sending clients billing statements on his personal letterhead stationery. These "letterhead billing statements" were not handled through the Sessions Fishman accounting department, and indeed, the firm had no knowledge that respondent had done any work for these clients because he did not enter his hours in the firm's timekeeping system. Respondent would then receive the check from the client, cash it, and keep the money for himself.
Early in 2004, Marguerite Bougere, a client of the Sessions Fishman firm for whom respondent had handled several legal matters, questioned the amount of the legal fees on a "letterhead billing statement" she received from respondent. Ms. Bougere consulted with a friend, attorney Edith Morris, who suggested that Ms. Bougere call the accounting department at Sessions Fishman to request copies of her detailed billing statements. Upon learning that the accounting department had never sent bills to Ms. Bougere, and further that Ms. Bougere had made her checks payable directly to respondent, Ms. Morris contacted Mr. Alltmont to alert him to the problem. A limited investigation by Mr. Alltmont found that the firm had no record of any billings or collection activity regarding Ms. Bougere in the time frame covered by the "letterhead billing statements." The law firm also discovered that respondent's misconduct was not confined to the Bougere file, and that he had on multiple occasions created false billings "off the books" in order to collect fees from clients which he then converted to his own use.
Mr. Alltmont and others confronted respondent, who initially denied that he had done anything improper.[3] Respondent eventually admitted his misconduct, and in March 2004 he was dismissed from Sessions Fishman.[4] In April 2004, after respondent had accepted a position with his present law firm, Mr. Alltmont told respondent that if he did not report this matter to the ODC, the firm would have no choice but to do so.
By letter dated July 1, 2004, respondent's counsel reported to the ODC that respondent suffers from a "condition of mental impairment," specifically his "impulsive and uncontrollable urges to cash relatively small checks for payment of his legal services which should have been deposited into his former law firms' accounts."

DISCIPLINARY PROCEEDINGS
Following its investigation, the ODC filed one count of formal charges against respondent, alleging that his conduct violated Rules 8.4(a) (violation of the Rules of Professional Conduct) and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct. Respondent answered the formal charges and admitted his misconduct, but requested a hearing in mitigation.
Prior to the hearing, respondent filed a memorandum characterizing his misconduct as "more in the nature of a breach of *541 contract with his law firm." Respondent asserted that this misconduct was caused by a mental disability, and he proposed that he be publicly reprimanded with indefinite probation and monitoring. The ODC sought permanent disbarment for respondent's commission "of the most serious form of professional misconduct under our rules . . . dishonesty, fraud, deceit and misrepresentation."

Mitigation Hearing
Because respondent did not dispute the ODC's allegations of misconduct, the hearing before the committee was limited to the issue of mitigation. The committee received documentary evidence submitted by both respondent and the ODC.
The ODC presented testimony from five of respondent's former law partners. These witnesses testified they believed that respondent was living beyond his means and that his lifestyle was not consistent with the income he earned as an attorney.
Respondent introduced medical reports and testimony in support of his contention that his misconduct was caused by a compulsive disorder. In particular, respondent relied on testimony from Chester Scrignar, M.D., a psychiatrist who had treated him since March 2004.[5] Dr. Scrignar diagnosed respondent as suffering from an impulse control disorder, not otherwise specified, and a major depressive disorder. Dr. Scrignar testified on direct examination that impulse control disorders involve the frontal lobe of the brain as well as a "behavior component." Dr. Scrignar testified that in his opinion, respondent's "diversion" of funds that should have gone to his law firms is not a purely criminal act, but was driven by an impulse to gain relief from the physiological discomfort he was then experiencing. Dr. Scrignar acknowledged that there was "a certain amount of premeditation" involved in respondent's conduct, but nevertheless there was no question in his mind that a causal relationship existed between respondent's conduct and his impulse control disorder.
Respondent also presented testimony from Richard Roniger, M.D., a psychiatrist who evaluated him solely for purposes of the disciplinary hearing.[6] Dr. Roniger diagnosed respondent as suffering from obsessive-compulsive disorder and dysthymic disorder. Dr. Roniger testified that because the amount of money respondent took from the law firms was relatively insignificant compared to his income, he believed respondent was "seeking fulfillment," rather than money. On cross-examination, however, Dr. Roniger admitted that he was unaware that respondent appeared to have been living a lifestyle that was substantially higher than he could afford on his salary.
In his own testimony before the committee, respondent admitted that he knew his actions were wrong. However, he explained that he diverted money from his law firms in order to make himself feel better when he had "bad feelings" inside of him. Respondent testified that he has changed immensely since he began treating with Dr. Scrignar. He further testified he voluntarily signed a two-year recovery agreement with the Lawyers Assistance Program ("LAP") and regularly attended meetings with a *542 depression support group in New Orleans sponsored by LAP.

Hearing Committee Report
At the conclusion of the hearing, the hearing committee issued its report. The committee made a factual finding that respondent misappropriated approximately $15,000 from the Lowe Stein law firm and misappropriated approximately $15,000-$20,000 while employed at the Sessions Fishman firm. It further found members of the two affected law firms testified that they believed full restitution had been made by respondent for all misappropriated monies, though neither was absolutely certain in that regard. Based on these findings, the committee concluded that it was uncontroverted that respondent engaged in multiple violations of Rules 8.4(a) and 8.4(c) of the Rules of Professional Conduct.
The committee then turned to the issue of an appropriate sanction. The committee determined that the baseline sanction for respondent's misconduct is disbarment. As aggravating factors, the committee recognized the following: substantial experience in the practice of law (admitted 1983) and multiple incidents of misconduct over a period of several years at two separate law firms. In mitigation, the committee found the following: absence of a prior disciplinary record; self-reported violations and a cooperative attitude toward the proceedings; diagnosed with obsessive-compulsive disorder, anxiety, and depression; continues to see a psychiatrist; actively participated in LAP; restitution has been made to the two affected law firms; misappropriation of funds involved law firms for which he was employed rather than clients; and remorse.
Under all these circumstances, and particularly considering the mitigating factors present, the committee recommended that respondent be suspended from the practice of law for two years and one day, with one year and one day deferred, followed by two years of supervised probation.
Both respondent and the ODC filed objections to the hearing committee's report and recommendation.

Disciplinary Board Recommendation
Based on its review of the record, the disciplinary board found that the hearing committee's factual findings were not manifestly erroneous and adopted these findings as its own. Like the committee, the board determined that respondent violated Rules 8.4(a) and 8.4(c) of the Rules of Professional Conduct, noting that he admitted to misappropriating funds in the amount of approximately $50,000 from two law firms over a period of fifteen years. The board concluded that such conduct involved dishonesty, deceit, and fraud.
Turning to the issue of an appropriate sanction, the board determined that the baseline sanction for respondent's misconduct is disbarment under the ABA's Standards for Imposing Lawyer Sanctions.
In mitigation, the board recognized the following factors: absence of a prior disciplinary record, personal or emotional problems, mental disability, and remorse. The board found the record supports the following aggravating factors: dishonest or selfish motive, a pattern of misconduct, multiple offenses, substantial experience in the practice of law, and illegal conduct.
Considering these factors as well as jurisprudence from this court, the board determined a downward deviation from the baseline sanction of disbarment was appropriate. Accordingly, the board recommended that respondent be suspended from the practice of law for three years. The board also recommended that respondent be assessed with all costs of these proceedings.
*543 One board member dissented and would recommend that respondent be disbarred.
Both respondent and the ODC filed objections to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
Because respondent has admitted that he violated the Rules of Professional Conduct as charged in the formal charges, the sole issue presented for our consideration is the appropriate sanction for respondent's misconduct. In resolving that issue, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass'n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984).
It is clear that the baseline sanction for respondent's misappropriation of funds is disbarment. See In re: Kelly, 98-0368 (La.6/5/98), 713 So.2d 458; Louisiana State Bar Ass'n v. Hinrichs, 486 So.2d 116 (La.1986). Respondent's principal contention is that we should deviate downward from this baseline sanction due to evidence that he suffered from a mental condition during the time of the misconduct.
In In re: Stoller, 04-2758 (La.5/24/05), 902 So.2d 981, we discussed the appropriate analysis to be used under ABA Standard 9.32(i) in cases in which the respondent relies on a mental disability as a mitigating factor:
In essence, respondent argues that his condition constitutes a mental disability. In order to prove the mitigating factor of mental disability, ABA Standard 9.32(i) provides the lawyer must prove the following four factors by clear and convincing evidence:
(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
(2) the chemical dependency or mental disability caused the misconduct;
(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.
The commentary to Standard 9.32 emphasizes the "careful analysis" that is required in considering issues of mental disability offered as mitigating factors in disciplinary proceedings, and that "direct causation between the disability" *544 and the misconduct must be established. The commentary further discusses the weight to be assigned to this factor, indicating that "the greatest weight" should be assigned when the disability is the sole cause of the offense. If the disability is the principal cause of the offense, it should be given "very great weight"; if it is a substantial contributing cause of the offense, it should be given "great weight." In all other cases in which the disability is considered as mitigating, the commentary indicates it should be given "little weight."
In the instant case, respondent asserts that he has established a causal connection between his conduct and his impulse control disorder based on Dr. Scrignar's testimony. He further relies on Dr. Scrignar's opinion that he could not control his conduct.
While we recognize Dr. Scrignar's testimony suggests that respondent's disability was the sole cause of the misconduct, this testimony is not necessarily dispositive of the causation issue. Rather, as the trier of fact in bar disciplinary cases, we determine the weight to be given to expert testimony. See, e.g., Curole v. Curole, 02-1891 (La.10/15/02), 828 So.2d 1094 ("A trial court may give whatever weight it deems appropriate to the testimony of any and all witnesses, including that of experts.").
Based on our review of the record in its totality, we find Dr. Scrignar's conclusion that respondent's actions were beyond his control is at odds with many of the objective facts in this case. For example, although Dr. Scrignar testified respondent was not motivated by greed, the testimony of respondent's law partners uniformly established that it appeared respondent was living beyond his means and that his lifestyle was not consistent with the income he earned. Additionally, the record reveals respondent's methods of misappropriating funds evolved over time in order to allow him to avoid detection, suggesting his actions were not purely impulsive. See Stoller, 04-2758 at p. 12, 902 So.2d at 988 ("Respondent's repeated and deliberate actions over this lengthy period of time belie his contention that his misconduct was an aberration."). Finally, respondent himself admitted that he knew his actions were wrong when he testified, "[y]ou mull it over in your head so much that you rationalize any the moral implications of something you know is wrong."
Considering all these facts, we are unable to find that respondent's mental condition was the sole cause or even a principal or substantial cause of his misconduct. While respondent may have used his "lack of fulfillment" as a moral justification for his misappropriation, the record does not support the conclusion that there is any significant causal nexus between any mental disability and the misconduct. Accordingly, pursuant to ABA Standard 9.32(i), we give little weight to respondent's alleged mental disability.
Reduced to their essentials, respondent's actions demonstrate a fundamental lack of honesty which falls far below the standards expected of attorneys admitted to the bar of this state. We are particularly disturbed by the fact that after being dismissed from Lowe Stein, respondent sought employment at Sessions Fishman without disclosing the reason for his discharge. After the facts came to light, respondent represented to his law partners that "it would never happen again." Of course, this representation turned out to be a lie.
Candor and honesty are a lawyer's stock in trade. In re: Stamps, 03-2985 (La.4/14/04), 874 So.2d 113 (citing In re Scavone, 106 N.J. 542, 524 A.2d 813 *545 (1987)). The record of this case demonstrates to us that respondent has not acted with candor or honesty during his career as a lawyer.[7] Considering the fifteen-year history of deceit and dishonesty evidenced by this record, we would be remiss in our duty to protect the public if we accepted respondent's self-serving assertion that "it won't happen again."
In sum, we find no basis to deviate from the baseline sanction of disbarment. Accordingly, respondent must be disbarred.

DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that David H. Bernstein, Louisiana Bar Roll No. 1711, be and he hereby is disbarred. His name shall be stricken from the roll of attorneys and his license to practice law in the State of Louisiana shall be revoked. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
KNOLL, J., concurs in part and dissents in part and assigns reasons.
KNOLL, J., concurring in part and dissenting in part.
I concur in the majority's opinion insofar as it concludes that respondent's egregious conduct warrants disbarment. However, I find respondent's conduct merits permanent disbarment.
NOTES
[1] Respondent testified that he "panicked" when he was first confronted "out of the blue" and that caused him to blame his secretary.
[2] Lowe Stein did not conduct an audit to determine the total amount of its loss attributable to respondent's misconduct, but estimated that the dollar amount at issue was approximately $30,000. The firm also could not be certain how many times respondent took funds belonging to the firm; respondent guessed that he had done so on seven or eight occasions. When respondent departed Lowe Stein, the firm deducted the estimated amount of its loss from the amount owed to him for the value of his partnership interest.
[3] At the time of this confrontation, respondent had checks in his desk drawer that he intended to cash, but had not yet had the opportunity to do so. Respondent immediately began creating time entries for the files of the clients in question, which he then delivered to the accounting department along with the checks.
[4] Like Lowe Stein, Sessions Fishman did not conduct a comprehensive audit to quantify its loss due to respondent's misconduct. Through his counsel, respondent paid Sessions Fishman $2,000 in June 2004. This nominal sum was accepted by the firm as full restitution.
[5] Dr. Scrignar died in May 2007. Respondent's counsel informed this court at oral argument that respondent is continuing his treatment with another psychiatrist.
[6] Respondent was referred to Dr. Roniger by his counsel. Dr. Roniger interviewed respondent twice and reviewed certain records, including those from the disciplinary proceeding and those maintained by Dr. Scrignar.
[7] Over one hundred and fifty years ago, Abraham Lincoln succinctly explained the fundamental commitment to honesty which must be made by all lawyers: "resolve to be honest at all events; and if in your own judgment you cannot be an honest lawyer, resolve to be honest without being a lawyer." Abraham Lincoln, Fragment: Notes for a Law Lecture, July 1, 1850 in THE COLLECTED WORKS OF ABRAHAM LINCOLN, Vol. II, p. 82 (Roy P. Basler et al. eds., 1953).