|, ATTORNEY DISCIPLINARY PROCEEDINGS
 

 PER CURIAM.
 
 *
 

 This disciplinary matter arises from formal charges filed by the Office of Disci
 
 *344
 
 plinary Counsel (“ODC”) against respondent, John M. Sharp, an attorney licensed to practice law in Louisiana.
 

 UNDERLYING FACTS
 

 The underlying facts of this matter are largely undisputed. At all times relevant to this proceeding, respondent was the managing partner of the Baton Rouge office of the law firm of Sharp Henry Cer-niglia Colvin Weaver & Hymel, L.L.C. (“the firm”), where his practice was primarily confined to the representation of public utilities before the Louisiana Public Service Commission.
 

 In September 2002, Kenneth and Shelley Brady, along with their two young daughters, were injured in an automobile accident while driving in Mississippi. Mr. Brady was referred to respondent by a mutual friend, and respondent agreed to represent the interests of the Bradys in a claim for damages arising out of the accident. The Bradys signed the firm’s standard one-third contingency fee agreement for this representation. A file was opened on the Brady matter using the firm’s protocol, and a file number was assigned to the Brady case and included in the firm’s billing software. Time and expenses attributable to the case were billed to the file by |2respondent as well as other professionals in the firm, and such billings were regularly transmitted to the firm’s bookkeeping department for billing purposes. Furthermore, the firm made a cash advance to Mr. Brady which was also billed to the file.
 

 In December 2003, respondent received settlement checks on behalf of the Bradys’ daughters totaling $4,500. Respondent informed the Bradys that because Christmas was approaching and in consideration of the family’s financial difficulties,
 
 [1]
 
 he would defer collecting any attorney’s fees or expenses until such time as the entire case was resolved. Respondent did not consult with his partners before agreeing to this arrangement with the Bradys.
 

 Thereafter, in late August or early September 2004, respondent successfully settled Mr. Brady’s personal injury claim for $100,000, and settled Mrs. Brady’s claim for $50,000. At Mr. Brady’s request, respondent agreed to allow his clients to retain the entirety of the settlement proceeds and to pay the firm its attorney’s fees and expenses at a later date. Once again, respondent did not consult with his partners before agreeing to this arrangement with the Bradys. Respondent directed the insurance adjuster to remove the firm’s tax identification number from the settlement checks and to use his own tax identification number instead.
 
 [2]
 
 Respondent then turned over the entire $150,000 settlement directly to the Bradys with the understanding that the Bradys would later pay the sums owed to the firm. No funds were deposited into the firm’s trust account by respondent, and no settlement disbursement statement was prepared.
 

 IsWithin a few weeks of receiving the settlement funds, Mr. Brady began repaying the attorney’s fees and expenses due to the firm by bringing cash payments to respondent’s office. By May 2005, Mr. Brady had made cash payments totaling
 
 *345
 
 $49,500.
 
 [3]
 
 As each payment was made, the cash was placed in a safe in respondent’s office, either by respondent personally or by his secretary acting at his direction. Respondent did not report the payments to the firm.
 

 In the summer of 2005, an audit revealed that although the physical Brady file was closed after the case settled, the file was still reflected as open in the firm’s accounting system. Following an investigation, the partners discovered that the firm’s expenses in the case had never been collected. Suspecting something was amiss, the partners met with respondent in September 2005 and asked for an explanation. Respondent initially claimed that he had waived attorney’s fees and expenses for the Bradys as a gesture of goodwill because Mr. Brady was an “old friend.” Unbeknownst to respondent, however, the firm had dispatched an investigator to interview the Bradys. Mr. Brady told the investigator that he had not met respondent prior to the commencement of the representation and that respondent had indeed charged a fee and expenses, which he had paid to respondent in cash. Once the partners confronted respondent with the information obtained from Mr. Brady, respondent admitted that he had lied to them about waiving the fee. Respondent said that he had kept the fee out of “greed and arrogance” because he felt like he was entitled to more compensation from the firm. Respondent agreed to withdraw from the partnership and to pay restitution to the firm immediately.
 
 [4]
 

 ^DISCIPLINARY PROCEEDINGS
 

 In October 2006, the firm filed a complaint against respondent with the ODC.
 
 [5]
 
 In May 2007, the ODC filed one count of formal charges against respondent, alleging that his conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 1.15 (safekeeping property of clients or third persons), 8.4(a) (violation of the Rules of Professional Conduct), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).
 

 Respondent answered the formal charges, essentially admitting the factual allegations but denying that he violated the Rules of Professional Conduct. Respondent specifically denied that he intended to permanently deprive the firm of the attorney’s fees and expenses owed in the Brady case. Instead, respondent claimed that his only intention was “to assist the Bradys in overcoming their financial difficulties.” Moreover, with regard to the cash payments made by Mr. Brady which had accumulated in the safe, respondent contended that it was his intent to remit the funds to the firm “once the full amount due had been received.”
 

 Formal Hearing
 

 This matter proceeded to a formal hearing on the merits. Both respondent and the ODC introduced documentary evidence and called witnesses to testify before the committee. At the hearing, respondent offered medical reports and testimony showing that in June 2002 he was diag
 
 *346
 
 nosed with Attention Deficit Hyperactivity Disorder (ADHD). Respondent was prescribed Adderall for his condition, and the | ¿evidence indicates that he responded well to the medication. Respondent continues to this day to take Adderall under the care of a psychiatrist.
 
 [6]
 

 Respondent asserted that his medical condition should be considered a mitigating factor in this matter. Respondent’s psychiatrist and a psychologist called to testify on his behalf agreed that ADHD does not deprive an individual of the ability to know the difference between right and wrong, nor does it excuse respondent’s behavior subject of the formal charges. However, they stated that ADHD did affect respondent’s judgment and may help to explain why he lied when his partners initially confronted him with his misconduct. They also indicated that ADHD played a part in respondent’s conduct in the Brady case, as individuals with ADHD have difficulties with procedures, with following directives, and in maintaining attention and focus. On the other hand, the ODC introduced the testimony of several of respondent’s former partners, each of whom indicated that respondent did exemplary work as an attorney and had no difficulty handling complex legal matters, meeting deadlines, or getting his work done on time.
 

 Hearing Committee Report
 

 After considering the testimony and evidence presented at the hearing, the hearing committee made the following factual findings:
 

 The Bradys hired respondent to represent their interests and the interests of their two minor daughters in connection with a personal injury matter arising out of an automobile accident. A friend referred them to respondent.
 

 The representation was apparently undertaken on behalf of the firm, and the Bradys signed the firm’s contingency fee agreement. A file was opened using the | fifirm’s protocol, and a file number was assigned to the Brady case and included in the firm’s billing software. Respondent and others in the firm billed time and expenses to the file. The firm also made a cash advance to Mr. Brady.
 

 In December 2003, respondent settled the claims of the Bradys’ daughters for a total of $4,500. Respondent unilaterally allowed the Bradys to retain the entire settlement amount with the understanding that the attorney’s fees and costs due to the firm would be paid once the entire case was resolved.
 

 In August 2004, respondent settled the claims of Mr. and Mrs. Brady for a total of $150,000. The Bradys asked respondent if they could retain the entirety of the settlement proceeds and pay the firm its attorney’s fees and expenses over some loosely defined period of time. Respondent agreed without consulting his partners and directed the insurance adjuster to forward the funds directly to him using his own name and taxpayer identification number rather than that of the firm. Respondent did not deposit the settlement funds into the firm’s trust account, and no disbursement sheet was prepared. Instead, respondent turned over the entire amount to the Bradys with the understanding that the Bradys would pay the attorney’s fees over a period of time.
 

 Near the end of 2004, Mr. Brady began repaying the attorney’s fees and expenses by bringing cash payments in various
 
 *347
 
 amounts to respondent’s office. He continued doing so through approximately May 2005. Generally, Mr. Brady presented the payments to respondent’s secretary, Hope Dupuy, who either placed the payments in a safe or gave them to respondent, who then placed them in the safe.
 

 As Mr. Brady made the required payments, the cash accumulated in the safe. Respondent did not keep an accounting of how much was paid, or when payments were made, and apparently there was money in the safe that was from other sources including respondent’s personal funds. Likewise, Ms. Dupuy did not keep an |7accounting, as she was simply instructed to put the money in respondent’s desk. Ms. Dupuy was further instructed not to report the payments to the firm.
 

 The firm conducted an internal investigation after it was alleged there was a problem with the Brady file. The investigation revealed that the Brady file was still open on the firm’s accounting records without expenses being reimbursed while the physical file had been closed. The firm’s managing partners began to suspect that respondent had settled the Brady case “off the books” and had converted the firm’s attorney’s fees to his own use against the specific terms of the partnership agreement.
 

 In late August 2005, the firm’s Baton Rouge office closed temporarily because of Hurricane Katrina. Thereafter, respondent was requested to attend a partners’ meeting for the purpose of discussing the effects of Katrina on the firm. However, respondent was instead confronted by his partners concerning the Brady case. Respondent initially told his partners that he had waived the fee because Mr. Brady was an “old friend.” At the time of this confrontation, respondent was unaware that the managing partners had dispatched an investigator to locate the Bradys and interview them. During the course of that interview, the investigator learned from Mr. Brady that he was not an old friend of respondent’s and had never met him until he hired him to undertake his personal injury representation. The investigator also learned that the Bradys did, in fact, pay respondent the attorney’s fees in cash.
 

 Upon the return of the investigator, the managing partners listened to the taped interview with Mr. Brady and then confronted respondent once again. At this time, respondent admitted to taking the attorney’s fees from Mr. Brady and failing to remit them to the firm. When asked why he would do so, respondent’s response was “I got greedy” or “greed and arrogance.”
 

 Thereafter, the parties agreed that respondent would immediately provide the firm with the full amount due for the attorney’s fees and expenses in the Brady case. [^Respondent did so shortly thereafter. The partnership with respondent was immediately dissolved, and he was expelled from the firm. An accounting and settling of matters has taken place between respondent and his prior firm.
 

 The committee made no specific findings regarding the Rules of Professional Conduct respondent violated. However, the committee determined that respondent intentionally violated duties owed to the public and to the legal profession. The committee noted there were ample opportunities for respondent to remit the funds paid by the Bradys to the firm, but he failed to do so even after returning to treatment for ADHD. His conversion of funds belonging to the firm caused actual harm. Relying on the ABA’s
 
 Standards for Imposing Laioyer Sanctions,
 
 the committee determined that the applicable baseline sanction in this matter is disbarment.
 

 
 *348
 
 Regarding mitigating factors, the committee believed that “while ADHD may-help explain some component parts of the actions of [respondent] such as speaking without thinking, it did not in any way affect his ability to discern between right and wrong.... The ADHD is not a ‘cause and effect’ in this matter, and is not a factor to be given any weight as mitigation.” The committee found the following mitigating factors present: absence of a prior disciplinary record, character or reputation, full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, and restitution. The committee did not specifically address aggravating factors.
 

 In further support of disbarment, the committee cited
 
 In re: Bernstein,
 
 07-1049 (La.10/16/07), 966 So.2d 537. While a partner in two law firms, Mr. Bernstein converted fees belonging to the firms “off the books” and took steps to actively hide his conversion. When confronted, Bernstein acknowledged his activities but argued that a psychiatric condition mitigated his misconduct. This court gave little weight to that argument, concluding that the objective facts of the case demonstrated that | {¡Bernstein’s actions were not beyond his control, as he claimed. Therefore, the court did not find that Bernstein’s mental condition was the sole cause or even a principal or substantial cause of his misconduct. Bernstein was disbarred.
 

 Likewise, the committee found that the objective facts of this ease demonstrate that respondent’s conduct was not beyond his control. Respondent’s physicians did not testify that there was a direct correlation between his mental condition and his conduct. The committee found that respondent’s ADHD was not the sole cause or even a principal or substantial cause of his misconduct, and gave little or no weight to respondent’s mental disability.
 

 Based on this reasoning, and finding no basis to deviate from the applicable baseline sanction, the committee recommended that respondent be disbarred.
 

 Respondent filed an objection to the hearing committee’s recommendation, contending that the sanction of disbarment is unduly harsh and that the committee failed to give adequate weight to the mitigating factors present in this case.
 

 Disciplinary Board Recommendation
 

 After reviewing the matter, the disciplinary board determined that the record supports the hearing committee’s factual findings. Respondent failed to safeguard the Bradys’ property and failed to institute any safeguards to separate his own funds from the cash he received from Mr. Brady. Respondent testified that he did not count the cash, did not issue receipts to Mr. Brady, and did not keep a repayment ledger. He also failed to ensure that the funds paid by Mr. Brady were applied toward his debt to the firm for attorney’s fees and costs. Indeed, respondent admitted that as of the day of the formal charge hearing in Api’il 2008, he still did not know exactly how much cash Mr. Brady had paid in the years 2004 and 2005.
 

 | ipThe board found the record also supports the conclusion that respondent intended to permanently deprive his law firm of the cash payments made by Mr. Brady. The committee heard testimony of several of respondent’s former law partners, who recounted how respondent effectively admitted that he intended to keep the money because he was motivated by greed and arrogance. The committee found the testimony of these witnesses was more credible than respondent’s explanation that he was holding the cash until the debt was fully paid.
 

 In further support of the ODC’s contention that respondent intended to perma
 
 *349
 
 nently deprive his firm of its fees and costs, the committee received evidence that respondent directed the settling insurance company to make the settlement checks payable to respondent and the Bra-dys, rather than to his firm and the Bra-dys. In contrast, the committee heard respondent’s elaborate explanation that he did not want his firm to incur a tax liability until the firm actually received its fees, which he always intended to forward to the firm once the full amount was paid. Faced with this conflicting evidence and testimony, the committee determined that the more credible explanation was that respondent intended to keep for himself the cash that Mr. Brady paid.
 

 Citing
 
 In re: Bolton,
 
 02-0257 (La.6/21/02), 820 So.2d 548, the board noted that such credibility determinations should not be overturned unless the record reflects they are clearly wrong. The board found nothing in the record suggests that the committee was clearly wrong to reject respondent’s claim that he was holding the cash until the full amount was received, especially given respondent’s admission that he did not even know the amount of cash Mr. Brady had paid.
 

 Based on these findings, the board determined that respondent violated the Rules of Professional Conduct as alleged in the formal charges. Specifically, respondent violated Rule 1.15(a) when he failed to ensure that cash received from the _|_n Bradys toward payment of the firm’s costs and attorney’s fees was accounted for and applied toward the debt. Respondent admitted that he did not know exactly how much cash Mr. Brady had given him, and that he kept that cash along with his own cash in a personal safe. Furthermore, when respondent received two settlement checks made payable to himself and his clients, he did not deposit the checks into a trust account or otherwise separate the firm’s funds from those of the clients. Instead, he handed the cheeks over to the Bradys. The board also determined that respondent violated Rule 8.4(c) because he admitted that he lied to his partners when he told them that he waived the Bradys’ attorney’s fees. Furthermore, respondent converted to his own use the cash the Bradys paid, which cash he should have given to the firm. Finally, respondent violated Rule 8.4(a) by handing over the settlement checks to the Bradys and crafting a repayment arrangement with Mr. Brady such that only the Bradys would separate their own property from the firm’s property. The repayment arrangement also allowed respondent to avoid reporting the fact of the settlement to the firm. Ultimately, the repayment arrangement — -a cash only plan where no ledger or firm accountings were kept — allowed respondent to easily convert to his own use the cash which Mr. Brady intended to pay to the firm.
 

 The board determined that respondent knowingly and intentionally violated duties owed to his clients, the public, and the legal profession. He caused serious injury to the firm and potentially serious injury to his clients. The board agreed with the committee that disbarment is the applicable baseline sanction.
 

 In aggravation, the board found a dishonest or selfish motive, vulnerability of the victims (the Bradys were in a precarious financial situation), and substantial experience in the practice of law (admitted 1988). The only mitigating factor found by the board was the absence of a prior disciplinary record.
 

 | 12The board agreed with the committee that
 
 Bernstein
 
 provides guidance. The board further cited
 
 In re: Kelly,
 
 98-0368 (La.6/5/98), 713 So.2d 458, wherein this court imposed a three-year suspension upon an attorney who converted approxi
 
 *350
 
 mately $80,000 belonging to his law firm. Numerous mitigating factors were present, including mental disability, which caused Kelly’s misconduct, and Kelly’s immediate acknowledgment of wrongdoing when confronted by his law partners.
 

 Considering respondent’s misconduct, and the aggravating factors which well outweigh the mitigating factors, the board found that no downward departure from the applicable baseline sanction is warranted. Accordingly, the board recommended that respondent be disbarred.
 

 Respondent filed an objection to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
 

 DISCUSSION
 

 Bar disciplinary matters fall within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence.
 
 In re: Quaid,
 
 94-1316 (La.11/30/94), 646 So.2d 343;
 
 Louisiana State Bar Ass’n v. Boutall,
 
 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings.
 
 See In re: Caulfield,
 
 96-1401 (La.11/25/96), 683 So.2d 714;
 
 In re: Pardue,
 
 93-2865 (La.3/11/94), 633 So.2d 150.
 

 In this matter, the hearing committee found that respondent converted to his own use approximately $50,000 belonging to his law firm and that he initially lied to 1 ishis partners upon being confronted with his misconduct. The record supports these findings. Moreover, for the reasons expressed by the disciplinary board, the record supports a finding that respondent intended to permanently deprive the firm of the funds. Accordingly, there is clear and convincing evidence that respondent has violated the Rules of Professional Conduct as alleged in the formal charges.
 

 Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In considering that issue, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct.
 
 Louisiana State Bar Ass’n v. Reis,
 
 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances.
 
 Louisiana State Bar Ass’n v. Whittington,
 
 459 So.2d 520 (La.1984).
 

 The baseline sanction for respondent’s misappropriation of fees and expenses due to his law firm is disbarment.
 
 See In re: Bernstein,
 
 07-1049 (La.10/16/07), 966 So.2d 537;
 
 In re: Kelly,
 
 98-0368 (La.6/5/98), 713 So.2d 458;
 
 Louisiana State Bar Ass’n v. Hinrichs,
 
 486 So.2d 116 (La.1986). In his brief to this court, respondent does not seriously dispute this fact; rather, his principal contention is that the mitigating factors present justify a substantial downward deviation from disbarment.
 

 We acknowledge that some mitigating factors are present, including the absence of a prior disciplinary record, character or reputation, and remorse. However, there are significant aggravating factors supported by the record, notably a dishonest or selfish motive, a pattern of misconduct (respondent converted four separate cash payments received from Mr. Brady over a
 
 *351
 
 period of approximately eight months), vulnerability of the victim (the Bradys, who were placed at risk for a claim by the 114fírm for the payment of its attorney’s fees and expenses), and substantial experience in the practice of law (admitted 1988). Moreover, as noted by both the hearing committee and the disciplinary board, the record simply does not support respondent’s contention that there is any causal nexus between his misconduct and his ADHD. Accordingly, pursuant to the ABA’s
 
 Standards for Imposing Lawyer Sanctions,
 
 we give little weight to the mitigating factor of mental disability.
 
 [7]
 

 Taking into account all the circumstances of this case, with particular note of respondent’s dishonesty when first confronted with his misconduct, we find no downward deviation is warranted from the baseline sanction of disbarment. Accordingly, we will accept the recommendation of the disciplinary board and disbar respondent. We further order respondent to make full restitution to his former law firm.
 

 DECREE
 

 Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that John M. Sharp, Louisiana Bar Roll number 19149, be and he hereby is disbarred. His name shall be stricken from the roll of attorneys and his license to practice law in the State of Louisiana shall be revoked. It is further ordered that respondent shall make full restitution to the law firm of Sharp Henry Cerniglia Colvin Weaver & Hymel, L.L.C. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
 

 *
 

 Retired Judge Philip Ciaccio, assigned as Justice
 
 ad hoc,
 
 sitting for Justice Chet D. Traylor, now retired.
 

 [1]
 

 . Mr. Brady, a firefighter, was out of work for six months after the automobile accident to recover from back surgery, while Mrs. Brady was a cancer survivor who did not work outside the home as a result of her serious health problems.
 

 [2]
 

 . Respondent claimed that he took this action in order that the firm would not have to pay taxes on a fee it had not yet received.
 

 [3]
 

 . In all likelihood this was not the entire sum the Bradys owed the firm, but Mr. Brady testified that respondent never told him how much more he owed.
 

 [4]
 

 . Respondent borrowed some $52,000 to repay the firm, but there was still a small balance of $8,000 due and owing at the time of the formal charge hearing.
 

 [5]
 

 . The firm made a verbal report to the ODC shortly after learning of the misconduct; however, the complaint filed in October 2006 was a formal complaint filed by counsel on behalf of the firm.
 

 [6]
 

 . There was a gap in treatment from June 2004 through February 2005 caused by the unavailability of respondent’s psychiatrist.
 

 [7]
 

 . Alternatively, respondent suggests that his ADHD may be considered as a personal or emotional problem. This court has noted that "it would be an exercise in absurdity if we were to hold that a medical condition which does not satisfy the requirements to be considered in mitigation as a mental disability could be entitled to the same weight if simply re-labeled as a personal and emotional problem.”
 
 In re: Stoller,
 
 04-2758, p. 13 (La.5/24/05), 902 So.2d 981, 989.