# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                            NEWS RELEASE #053

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **5th day of December, 2018**, are as follows:

**PER CURIAM**:

2018-B-1233        IN RE: SALVADOR R. PERRICONE
                   Upon review of the findings and recommendations of the hearing
                   committee and disciplinary board, and considering the record, the
                   briefs, and oral argument, it is ordered that Salvador R.
                   Perricone, Louisiana Bar Roll number 10515, be and he hereby is
                   disbarred.   His name shall be stricken from the roll of
                   attorneys, and his license to practice law in the State of
                   Louisiana shall be revoked.  All costs and expenses in the matter
                   are assessed against respondent in accordance with Supreme Court
                   Rule XIX, § 10.1, with legal interest to commence thirty days
                   from the date of finality of this court's judgment until paid.

                   Retired Judge Gay Gaskins, assigned as Justice ad hoc, sitting
                   for Guidry, J., recused.

                   Retired Judge Hillary Crain, assigned as Justice ad hoc, sitting
                   for Weimer, J., recused.

                   WEIMER, J., recused.
                   GUIDRY, J., recused.
                   CRICHTON, J., additionally concurs and assigns reasons.

**12/05/18**

SUPREME COURT OF LOUISIANA

NO. 2018-B-1233

IN RE: SALVADOR R. PERRICONE

ATTORNEY DISCIPLINARY PROCEEDING

PER CURIAM[*]

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Salvador R. Perricone, an attorney licensed to practice law in Louisiana.

**UNDERLYING FACTS**

The underlying facts of this case are largely undisputed. By way of background, respondent commenced employment as an Assistant United States Attorney ("AUSA") with the United States Attorney's Office for the Eastern District of Louisiana ("USAO") in 1991. At all times relevant to these proceedings, respondent was a Senior Litigation Counsel and the USAO's training officer.

During the times pertinent to these proceedings, a New Orleans newspaper, *The Times-Picayune*, maintained an Internet website identified as nola.com. The website typically permitted readers to post comments to news stories using pseudonyms and/or anonymous identities.

Beginning in or around November 2007 and continuing through March 14, 2012, respondent was a frequent poster of comments on a myriad of subjects on nola.com,[1] including comments on cases which he and/or his colleagues at the

---

[*] Retired Judge Gay Gaskins, assigned as Justice Ad Hoc, sitting for Guidry, J., recused; Retired Judge Hillary Crain, assigned as Justice Ad Hoc, sitting for Weimer, J., recused.

[1] All nola.com comments cited in this memorandum are set forth precisely as they were posted by

USAO were assigned to prosecute. Of the more than 2,600 comments respondent posted, between one hundred and two hundred – less than one percent – related to matters being prosecuted in the USAO. None of the comments identified respondent by name or as an employee of the USAO. Rather, respondent posted on nola.com using at least five online identities: "campstblue," "legacyusa," "dramatis personae," "Henry L. Mencken1951," and "fed up."

*Count I*

In 2009, the FBI and the USAO commenced an investigation into allegations of corruption against various Jefferson Parish officials. In particular, investigations included allegations involving improper health insurance contracts between government entities and/or contractors and an insurance company owned by Tim Whitmer, the Jefferson Parish Chief Administrative Officer. Among the insurance contracts under investigation was one with River Birch, Inc., a privately held landfill company owned by Fred Heebe, whose company had been awarded a $160 million landfill contract with Jefferson Parish.

In February 2011, a federal grand jury indicted Henry Mouton, a former member of the Louisiana Wildlife and Fisheries Commission. The indictment charged that "co-conspirator A" paid Mr. Mouton more than $400,000 to use his influence with the Commission to force the closure of the Old Gentilly Landfill, which competed with River Birch. In June 2011, Mr. Mouton pleaded guilty to conspiracy.

An additional investigation alleged embezzlement by Dominick Fazzio, the chief financial officer for River Birch, and his brother-in-law, Mark Titus. Mr. Titus pleaded guilty and cooperated in the subsequent indictment of Mr. Fazzio for

---

respondent, without corrections of typographical errors, spelling, grammar, or punctuation.

fraud and money laundering.   Respondent was not on the prosecution team in that case, which was assigned to United States District Judge Ginger Berrigan in the Eastern District, but he did enroll for the limited purpose of disqualifying attorney Stephen London as Mr. Fazzio's trial counsel.

During the pendency of these investigations and prosecutions, respondent began commenting on nola.com using the pseudonym "Henry L. Mencken1951":

> If Heebe had one firing synapse, he would go speak to Letten's posse and purge himself of this sordid episode and let them go after the council and public officials. Why prolong this pain...perhaps Queen Jennifer has something to say about that.[2]
> -December 18, 2011, 10:21 a.m.
>
> Heebe comes from a long line of corruptors.
> -September 3, 2011, 10:55 a.m.
>
> Heebe's goose is cooked.
> -September 4, 2011, 10:45 a.m.

As regards a nola.com story announcing the indictment of Mr. Mouton, respondent commented using his pseudonym "legacyusa," writing:

> I read the indictment...there is no legitimate reason for this type of behavior in such a short period of time and for a limited purpose.   GUILTY!!!
> -February 26, 2011, 9:16 a.m.

As regards a nola.com article on the indictment of Mr. Fazzio, respondent posted a comment using his pseudonym "dramatis personae" and wrote:

> Well, Mr. Fazzio, I hope you have room in your scrap book for your conviction and mug shot.   London didn't too well with Archie Kaufman.   You're next.[3]
> -August 5, 2011, 3:09 p.m.

---

[2] "Jennifer" is Mr. Heebe's wife, Jennifer Sneed, who was a member of the Jefferson Parish Council when the River Birch contract was approved.

[3] Mr. London also represented NOPD officer Archie Kaufman in the Danziger Bridge trial.   See Count III.

Following Judge Berrigan's decision to disqualify Mr. Fazzio's attorney due to a conflict, Mr. Fazzio hired Arthur "Buddy" Lemann as his new attorney, as reported on nola.com. Respondent commented using "Henry L. Mencken1951," writing:

> Looks like Fazzio got a lemon. That book you refer to
> Mr. Rioux is about all of his losses. The guy is a clown
> and Fazzio is going down.
> -January 13, 2012, 10:36 p.m.

In another post following Judge Berrigan's disqualification order, respondent commented as "Henry L. Mencken1951" and wrote:

> It's the right decision. Judges don't take this action
> lightly. There must be something going on we don't
> know about or the TP is too stupid (more likely) to
> understand. Please get to the bottom of this, PLEASE!!!
> -January 5, 2012, 7:36 p.m.

Radio personality Garland Robinette was featured in an article in *The Times-Picayune* which reported that Mr. Heebe provided him a $250,000 interest-free loan allegedly in exchange for Mr. Robinette's on-air opposition to reopening the Old Gentilly Landfill rather than honoring the $160 million River Birch contract. Mr. Robinette had been notified that he was the subject of an investigation by the FBI and the USAO. Using "Henry L. Mencken1951," respondent wrote on nola.com:

> Looks like he got another 250K to keep his mouth shut.
> What a show!! WWL radio is dead!!!
> -September 6, 2011, 10:13 a.m.

> TRANSLATION: Heebe's attorney won't let me talk, lest
> I implicate his client. Additionally, I am New Orleans
> Royalty and I don't have to explain anything to anyone.
> -September 7, 2011, 7:59 a.m.

*Count II*

Respondent prosecuted Mose Jefferson, the brother of Congressman William Jefferson, in a case in which he was indicted for bribing former Orleans Parish School Board president Ellenese Brooks-Simms. During the trial, respondent

4

posted comments on nola.com about Mose Jefferson and his attorney, Mike Fawer, under the pseudonym "campstblue":

> Fawer has screwed his client!!!! He revealed exactly what Mose needed on the board to get what Mose wanted. Good job Mike!!!! You're just as arrogant as Ellenese ... and the jury knows it.
> -August 15, 2009, 9:19 p.m.
>
> They got the corrupted, now they have to get the corruptor.
> -August 16, 2009, 7:41 p.m.

In a second indictment not personally prosecuted by respondent, Mose Jefferson, his sister Betty Jefferson, and Renee Gill Pratt were charged with sending funds to a Jefferson-controlled non-profit. William Jefferson was then pending trial on corruption charges in Virginia. Using the name "legacyusa," respondent posted:

> The sad part of all this is that Bill is preventing his siblings from pleading guilty and cooperating, thus exposing them to more prison time. Additionally, local defense attorneys are just milking these cases for their own ego gratification and financial enrichment. Something is sick about our system.
> -May 22, 2009, 9:40 p.m.

*Count III*

On September 4, 2005, six days after Hurricane Katrina struck New Orleans, a group of New Orleans police officers shot at unarmed civilians crossing the Danziger Bridge. Two persons were killed and four others were wounded. In July 2010, six officers were indicted in federal court for their roles in either the shooting or the ensuing alleged cover-up of the shooting. United States District Judge Kurt Engelhardt presided over the trial which commenced on June 22, 2011 and ended on August 5, 2011, when the jury returned guilty verdicts against all defendants. On April 4, 2012, Judge Engelhardt sentenced the defendants to terms of incarceration ranging from 6 to 65 years.

While respondent was not part of the prosecution team, he nevertheless posted comments on nola.com prior to and during the trial, including as the jury was deliberating. Posting as "dramatis personae," respondent stated:

> I agree with [nola.com poster] Cauane. The same hurricane that hit Orleans Parish, hit Jefferson, St. Bernard, Plaquemine, and St. Tammany. Yet, the only police force to use deadly force throughout the city was the venerable NOPD. Perhaps we would be safer if the NOPD would leave next hurricans and let the National Guard assume all law enforcement duties. GUILTY AS CHARGED.
> -August 3, 2011, 7:06 a.m.

Even prior to the trial, in response to an article regarding a rumored plea by a police officer co-defendant, respondent, posting as "legacyusa," warned:

> Despite defense attorneys protestations to the contrary, It would be prudent for those involve to consider the track record of the US Attorney's Office. Letten's people are not to be trifled with.
> -February 23, 2010, 6:17 p.m.

As regards police officer co-defendant Archie Kaufman, respondent wrote:

> The cover up is always worse than the crime. Archie, your time is up.
> -February 23, 2010, 10:44 p.m.

Following the publication of an article about a cooperating defendant and government witness, respondent as "legacyusa" wrote:

> The Feds never forget....this officer is doing the right thing....wish the others would, then IT would be over.
> -May 20, 2010, 10:41 p.m.

During the trial, respondent as "legacyusa" posted:

> NONE of these guys should had have ever been given a badge. We should research how they got on the police department, who trained them, who supervised them and why were they ever been promoted. You put crap in – you get crap out!!!
> -June 22, 2011, 8:19 a.m.

Also during the trial, respondent as "dramatis personae" denigrated the testimony given by one of the defendants:

6

> Where is Madison's gun?   Come on officer, tell us.   You
> shot because you wanted to be part of something, you
> thought, was bigger than you.   You let your ego control
> your emotions.   You wanted to be viewed as a big man
> among the other officers.   That's the creed of the NOPD
> and I hope the jury ignores your lame explanation and
> renders justice for Mr. Madison.   To do less, is to sanction
> any cop who decides it is in his best interest to put a load
> of buckshot in the back of a disabled american in broad
> daylight.
> -July 28, 2011, 8:16 a.m.

While the jury deliberated, respondent as "dramatis personae" stated:

> I don't think the jury will leave the dead and wounded on
> the bridge.
> -August 4, 2011, 5:53 p.m.

When respondent's online commenting was discovered and reported to Judge Engelhardt, an investigation ensued.   Following the investigation, Judge Engelhardt reversed the convictions of the Danziger Bridge defendants and granted their motions for new trial, citing "grotesque prosecutorial misconduct," including respondent's online commenting as well as other instances of prosecutorial misconduct by the USAO, by members of the Department of Justice, and by federal law enforcement.[4]   In finding defendants were denied due process, Judge Engelhardt stated:[5]

> [I]t is difficult to conceive, much less accept, that this
> time-honored constitutional procedure successfully
> withstood an attack of the ferocity seen here, a campaign
> extending back to the commencement of the DOJ's active
> investigation of this case in 2008, and continuing through
> the acceptance of related plea agreements, the indictment,
> and the trial itself. To conclude that such misconduct was
> only a little unfair, but not enough to be harmful, turns the
> fundamental principle of due process on its head.

Judge Engelhardt clearly found the conduct of Perricone to be intentional. Judge Engelhardt found Perricone "viewed posting of highly-opinionated comments as a

---

[4] *United States v. Bowen*, 969 F. Supp. 2d 546 (E.D. La. 2013).

[5] 969 F. Supp. 2d at 617.

'public service.'"[6]  The district court also found that the fact that the government's actions, including Perricone's actions, were conducted anonymously made "it all the more egregious, and forces the Court, the defendants, and the public into an indecent game of 'catch-me-if-you-can.'"[7]

The Department of Justice appealed Judge Engelhardt's decision, and on August 18, 2015, the United States Fifth Circuit Court of Appeals affirmed the order and remanded the case for a new trial.[8]  In so doing, the court noted that the government acknowledged "significant, repeated misconduct by Perricone," and explained:[9]

> The government concedes Perricone "intentionally committed professional misconduct" violating (a) federal regulations restricting extrajudicial statements by DOJ personnel relating to civil and criminal proceedings, (b) DOJ policies and (c) court and state bar rules of professional conduct. The government acknowledges that besides his postings in this case, Perricone posted "thousands" of anonymous comments on various topics over the course of several years.

Following this ruling, Judge Engelhardt accepted a plea deal brokered by defense lawyers and the Department of Justice, which called for the Danziger Bridge defendants to plead guilty to significantly lesser offenses in exchange for substantially reduced prison sentences ranging from 3 to 12 years.

## DISCIPLINARY PROCEEDINGS

In April 2017, the ODC filed formal charges against respondent.  The ODC alleged that because respondent's client (the Department of Justice and the USAO)

---

[6] *Id.* at 619-20.

[7] *Id.* at 626.

[8] *United States v. Bowen*, 799 F.3d 336 (5th Cir. 2015).

[9] *Id.* at 350.

forbid extrajudicial statements by an AUSA such as those set forth in the formal charges, respondent placed his own interests above those of his client, in violation of Rule 1.7(a)(2) of the Rules of Professional Conduct. The ODC further alleged that respondent made extrajudicial statements about the guilt or innocence of defendants and/or others under investigation or prosecution that had a substantial likelihood of materially prejudicing an adjudicative proceeding, in violation of Rule 3.6, and of heightening public condemnation of the accused, in violation of Rule 3.8(f); that respondent's conduct was prejudicial to the administration of justice, in violation of Rule 8.4(d); and that respondent violated or attempted to violate the Rules of Professional Conduct, or did so through another, in violation of Rule 8.4(a).

Respondent answered the formal charges and admitted the factual allegations therein, including all of the quoted posts on nola.com. He stated that he made the anonymous online comments to relieve stress, not for the purpose of influencing the outcome of a defendant's trial. He further stated that his anonymous comments did not identify him as an AUSA, and as such, he did not intend, nor did he reasonably expect, that his conduct would influence the outcome of a trial, prejudice the fairness of any subsequent legal proceeding, or otherwise prejudice the administration of justice. Accordingly, respondent denied violating the Rules of Professional Conduct.

*Hearing Committee Report*

Prior to a hearing in the matter, respondent and the ODC filed into the record a stipulation that respondent violated Rules 3.6, 3.8(f), 8.4(a), 8.4(d) of the Rules of Professional Conduct. Respondent reserved his right to present evidence of his mental intent as regards those violations, and all other factors under Supreme Court Rule XIX, § 10(C).

A hearing in mitigation was conducted. Respondent presented the testimony of various character witnesses. Additionally, respondent called Dr. Ron Cambias, his treating psychologist since May 2016. Dr. Cambias testified that respondent suffered from complex post-traumatic stress disorder ("PTSD") triggered by numerous situations in which respondent, who was formerly employed as a police officer and FBI agent, had witnessed the gruesome deaths of others and had, himself, been threatened with physical harm, including gunfire. Dr. Cambias opined that respondent's online postings were the result of his PTSD.

At the conclusion of the hearing, the committee rendered its report. The committee explained that respondent testified he thought his blogging activities would help him to deal with the stress of his work as an AUSA, although he acknowledged that it actually exacerbated his stress and anxiety. The committee also discussed the expert testimony of Dr. Cambias. After reviewing this evidence, the committee found credible respondent's testimony that he was under a great deal of stress at work, especially in the period following Hurricane Katrina, when public corruption being investigated by the USAO was rampant. However, the committee noted it was "skeptical" of Dr. Cambias' diagnosis of PTSD and its causative role in respondent's blogging, but recognized no countervailing opinion testimony was offered.

The committee accepted respondent's stipulations that his actions violated Rules 3.6, 3.8(f), 8.4(a), and 8.4(d). The committee found that respondent also violated Rule 1.7(a)(2) by placing his own interests, *i.e.*, his need to "vent" about the criminal cases being prosecuted by the USAO, above the interests of that office, his client, in having those cases proceed unimpeded.

The committee determined that respondent violated duties owed to his client, the public, the legal system, and the profession, and found he acted knowingly. The

mistrial granted in the Danziger Bridge case was certainly an actual, serious injury,[10] as was the harm done by respondent to the post-Katrina recovery in New Orleans. Considering the ABA's *Standards for Imposing Lawyer Sanctions*, the committee determined the applicable baseline sanction is suspension.

In aggravation, the committee found the following factors: a selfish (but not dishonest) motive, a pattern of misconduct, multiple offenses, and substantial experience in the practice of law (admitted 1979). In mitigation, the committee recognized that at the time of respondent's misconduct, there were no regulations, rules, or guidelines regarding anonymous Internet postings.[11] Other mitigating factors are the absence of a prior disciplinary record, absence of a dishonest motive, personal or emotional problems, full and free disclosure and a cooperative attitude toward the disciplinary proceedings, character and reputation, imposition of other penalties or sanctions, and remorse.

Considering all of these factors, especially the absence of any guidelines or other authority in the 2007-2012 time period during which respondent's anonymous, online postings occurred, and the longstanding harm respondent's actions caused to the USAO, a majority of the committee recommended respondent be suspended from the practice of law for two years, with one year deferred. One member of the committee would have recommend that the entire suspension be deferred.

---

[10] The committee acknowledged that respondent's postings were not the sole cause of the mistrial, and that it would be speculative to consider whether the mistrial would have been granted absent the other contributing causes.

[11] Extrajudicial commentary was addressed in both the guidelines of the Justice Department and the Rules of Professional Conduct, but nothing addressed anonymous Internet commentary. Both respondent and former United States Attorney Jim Letten testified that they were unaware of any such guidelines in the critical 2007-2012 time period.

*Disciplinary Board Recommendation*

After reviewing this matter, the disciplinary board determined that the hearing committee's factual findings are not manifestly erroneous, and that the committee correctly found respondent violated the Rules of Professional Conduct, both as stipulated (Rules 3.6, 3.8(f), 8.4(a), and 8.4(d)) and as additionally found by the committee (Rule 1.7(a)(2)).

The board determined that respondent violated duties owed to his client (the USAO), the public, the legal system, and the profession. He acted knowingly and intentionally. For example, although his online comments materially prejudiced the Danziger Bridge case, respondent did not intend that particular outcome. Thus, his conduct with regard to Rule 3.6 was knowing. However, his conduct with regard to Rule 3.8(f) was intentional, as there is clear evidence that respondent intended to heighten public condemnation of various individuals being investigated or prosecuted by the USAO. As recounted in the formal charges, respondent's comments speculated on the guilt of various individuals subject to prosecution or investigation and cast these individuals in a very negative light. Respondent claims he did this only to relieve the stress he was under caused by his undiagnosed PTSD. However, respondent also testified that he engaged in "arguments" with other online commenters that were not related to matters being investigated or prosecuted by the USAO, such as LSU football. The board did not find it credible that while respondent was attempting to influence other commenters regarding benign topics like LSU football, he was not attempting to influence others with his comments about the guilt of various individuals subject to investigation or prosecution. Rather, the board found that respondent intended to heighten public condemnation of the individuals referenced in the formal charges with his online comments.

The board found the actual harm and potential for harm caused by respondent's misconduct is significant. Among other things, it found respondent's misconduct was a significant factor – although not the sole factor – that led Judge Engelhardt to grant a new trial in the Danziger Bridge case. It also noted respondent's online commenting received significant media attention. These actions harmed the perception of the legal profession and tarnished the reputation of the USAO. The publicity that respondent's conduct received diminished the public's faith in the legal system. Additionally, his actions caused delay and additional expenses in several pending proceedings.

In aggravation, the board found the following factors: a selfish motive, a pattern of misconduct, multiple offenses, and substantial experience in the practice of law. In mitigation, the board found the absence of a prior disciplinary record, absence of a dishonest motive, personal or emotional problems, full and free disclosure and a cooperative attitude toward the disciplinary proceedings, character and reputation, imposition of other penalties or sanctions, and remorse.[12]

However, the board specifically rejected respondent's argument that the hearing committee should have recognized the mitigating factor of mental disability due to his PTSD diagnosis. Citing ABA Standard 9.32(i) and *In re: Stoller*, 04-2758 (La. 5/24/05), 902 So. 2d 981, the board found respondent failed to prove his PTSD caused the misconduct. It pointed out Dr. Cambias testified that someone with PTSD can operate at a high level and that respondent knew right from wrong.[13]

_____

[12] Although the hearing committee had recognized in mitigation that there were no regulations, rules, or guidelines regarding anonymous Internet postings at the time of respondent's misconduct, the board rejected this as a mitigating factor. The board reasoned that first, this is not a mitigating factor recognized by the ABA Standards, and second, respondent should not benefit from the lack of a specific policy or rule prohibiting otherwise unethical misconduct.

[13] At this point in its report the board speculated whether respondent and First AUSA Jan Mann "were aware of each other's other online commenting as it was occurring," despite its express acknowledgment that "this issue was not discussed at length at the hearing or in pleadings." The board concluded, based upon a discussion of the issue in Judge Engelhardt's order, that "collusion" between respondent and Ms. Mann "undermines Respondent's claim that his online commentary

Thus, there does not appear to be clear and convincing evidence supporting the causation element. Based on the foregoing, the board concluded that the committee's determination that mental disability is not a mitigating factor appears to be reasonable and not erroneous.

Turning to the issue of an appropriate sanction, the board noted that there is no disciplinary case law in Louisiana discussing inappropriate extrajudicial statements by a prosecutor. However, the board took guidance from *In re: McCool*, 15-0284 (La. 6/30/15), 172 So. 3d 1058, in which an attorney was disbarred for launching a lengthy social media campaign to affect the outcome of a case she was handling. The board found that the extensive scope of respondent's misconduct and the significant actual and potential harm it caused justifies a sanction on par with that imposed in *McCool*.

Based on this reasoning, the board recommended respondent be disbarred. The board also recommended that respondent be assessed with the costs and expenses of the proceeding.

One board member dissented as to the sanction, finding that disbarment is not warranted and that a two- to three-year suspension is appropriate for respondent's misconduct.

Respondent filed an objection to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

---

was something he did to relieve the stress caused by his undiagnosed PTSD." The issue of "collusion" between respondent and Ms. Mann is not at issue in this matter and therefore it was highly inappropriate for the board to engage in such speculation.

14

**DISCUSSION**

The underlying facts of this matter are not in dispute. It suffices to say that beginning in November 2007 and continuing through mid-March 2012, respondent, under various pseudonyms, frequently posted comments on an online site. Although these comments concerned a myriad of subjects, some pertained to cases which he and/or his colleagues at the USAO were assigned to prosecute. When discovered, respondent's actions caused serious, actual harm in the River Birch and Danziger Bridge cases and, most profoundly, to the reputation of the USAO. There was a potential for harm in the Jefferson and Gill-Pratt cases.

Respondent stipulated that his conduct violated Rules 3.6, 3.8(f), 8.4(a), and 8.4(d) of the Rules of Professional Conduct. He did not admit to the violation of Rule 1.7(a)(2) alleged in the formal charges, but that rule violation was found by both the hearing committee and the disciplinary board, and respondent did not lodge an objection in this court to said finding. Accordingly, like the underlying facts, the rule violations in this matter are not in dispute.

We now turn to a determination of the appropriate sanction for respondent's actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. *Louisiana State Bar Ass'n v. Reis*, 513 So. 2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. *Louisiana State Bar Ass'n v. Whittington*, 459 So. 2d 520 (La. 1984).

Here, respondent violated duties owed to his client, the public, the legal system, and the profession. Respondent acted knowingly in that he knew his online postings were forbidden; however, he did not make the posts with the specific intent

15

to harm the outcome of the various criminal proceedings. Respondent acted intentionally in that he intended his posts would have the effect of heightening public condemnation of the individuals referenced in the formal charges.

Standard 5.22 of the ABA's *Standards for Imposing Lawyer Sanctions* provides that suspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process. Considering this standard, the applicable baseline sanction in this matter is suspension.

In aggravation, the following factors apply: a selfish motive, a pattern of misconduct, multiple offenses, and substantial experience in the practice of law. In mitigation, the following factors apply: absence of a prior disciplinary record, absence of a dishonest motive, personal or emotional problems, full and free disclosure and a cooperative attitude toward the disciplinary proceedings, character and reputation, imposition of other penalties or sanctions, and remorse.

Respondent's arguments in this court center almost entirely on whether we should recognize the mitigating factor of mental disability due to his diagnosis of complex PTSD. In *In re: Stoller*, 04-2758 (La. 5/24/05), 902 So. 2d 981, we cited four criteria which must be met for respondents to properly assert chemical dependency or mental disability as a mitigating factor: (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability; (2) the chemical dependency or mental disability caused the misconduct; (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely. The ABA commentary indicates that in considering issues of chemical

dependency or mental disability offered as mitigating factors in disciplinary proceedings, the "greatest weight" should be assigned when the disability is the sole cause of the offense.

As noted by the board, the focus of the inquiry in the instant case is on the second factor – namely, whether respondent's PTSD caused the misconduct at issue. Based on our review of the record, we find no clear and convincing support for the conclusion that respondent's mental condition had any causative effect on his misconduct. Respondent's psychologist testified that someone with PTSD can operate at a high level and that respondent knew right from wrong. This testimony is corroborated by respondent's own admission that even before his conduct was discovered, he knew he should not be engaged in posting extrajudicial comments. When asked why he engaged in commenting in a prohibited way, respondent candidly admitted that he was angry over public corruption and he vented this anger in the caustic criticism leveled against all who, in his judgment, warranted accountability, even though he knew this was improper.

Respondent's own testimony reveals he was aware that he should not post these comments, yet he decided to do so anyway. Clearly, any mental disability from which respondent suffered did not prevent him from knowing his actions were wrong. Under these circumstances, we find absolutely no support for the conclusion that respondent has proven his mental condition caused the misconduct. Accordingly, we decline to consider his mental disability in mitigation.

In formulating an appropriate sanction, we acknowledge the situation presented in this case is *res novo* in our jurisprudence, and our prior case law provides little useful guidance. However, we begin from the well-settled proposition that public officials (and prosecutors in particular) are held to a higher standard than ordinary attorneys. *In re: Griffing*, 17-0874 (La. 10/18/17), 236 So.

17

3d 1213. Respondent was clearly in an important position of public trust. His actions betrayed that trust and caused actual harm to pending prosecutions. Once discovered, his conduct tarnished the reputation of the USAO and brought the entire legal profession into disrepute.

In this age of social media, it is important for all attorneys to bear in mind that "[t]he vigorous advocacy we demand of the legal profession is accepted because it takes place under the neutral, dispassionate control of the judicial system." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1058 (1991). As the Court in *Gentile* wisely explained, "[a] profession which takes just pride in these traditions may consider them disserved if lawyers use their skills and insight to make untested allegations in the press instead of in the courtroom." *Id.*

Respondent's conscious decision to vent his anger by posting caustic, extrajudicial comments about pending cases strikes at the heart of the neutral dispassionate control which is the foundation of our system. Our decision today must send a strong message to respondent and to all the members of the bar that a lawyer's ethical obligations are not diminished by the mask of anonymity provided by the Internet.

In summary, considering respondent's position of public trust as a prosecutor, his knowing and intentional decision to post these comments despite his acknowledgment that it was improper to do so, and the serious harm respondent's conduct has caused both to individual litigants and to the legal profession as a whole, we must conclude he has failed to comply with the high ethical standards we require of lawyers who are granted the privilege to practice law in this state. The only appropriate sanction under these facts is disbarment.[14]

---

[14] Respondent suggested that he should be entitled to credit for the time he has spent away from the practice of law on a "voluntary" basis. Absent a formal interim suspension, there is no authority in Rule XIX for making discipline retroactive, and we decline to do so here. The period for seeking readmission from respondent's disbarment shall commence from the finality of our

**DECREE**

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, the briefs, and oral argument, it is ordered that Salvador R. Perricone, Louisiana Bar Roll number 10515, be and he hereby is disbarred.   His name shall be stricken from the roll of attorneys, and his license to practice law in the State of Louisiana shall be revoked.   All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

---

judgment in this case.

# SUPREME COURT OF LOUISIANA

# NO. 2018-B-1233

# IN RE: SALVADOR R. PERRICONE

# ATTORNEY DISCIPLINARY PROCEEDING

**CRICHTON, J., additionally concurs and assigns reasons**

I agree with the per curiam in all respects, and in particular, that respondent has failed to prove by clear and convincing evidence that Post Traumatic Stress Disorder was the cause for his misconduct. I write separately to note that this case highlights the difference between disbarment and permanent disbarment in attorney disciplinary proceedings.[1] Respondent took a voluntary absence from the practice of law during the pendency of these proceedings (approximately five years), in lieu of receiving an interim suspension. However, as the per curiam discusses in footnote 10, absent a formal interim suspension, La. Supreme Court Rule XIX does not provide authority for respondent to receive credit for self-imposed absence from the profession.[2] Had respondent agreed to interim suspension at the outset and received disbarment upon conclusion of formal disciplinary proceedings, respondent would be legally entitled to file a petition for reinstatement much sooner than under the

---

[1] Appendix E of Rule XIX provides the Guidelines for disbarment, and under Supreme Court Rule XIX, § 24(A), permanent disbarment prohibits an attorney from ever being readmitted to the practice of law in this state. Regular disbarment allows an attorney to petition for readmission five years after the effective date of disbarment.

[2] Rule XIX, § 24(A) states that a lawyer who has been placed on interim suspension and is then disbarred for the same misconduct that was the ground for the interim suspension may petition for readmission at the expiration of five years from the effective date of the interim suspension. This rule also states that when a lawyer is placed on interim suspension and is then suspended for the same misconduct that was the ground for the interim suspension, at the court's discretion, the term of the suspension may be applied retroactively to the date of the interim suspension. This Court has historically chosen to exercise our discretion in order to make suspensions run retroactive to the date of prior interim suspensions. See, e.g., *In re: Lacobee*, 03–2010 (La.2/20/04), 866 So.2d 237; *In re: Gaudin*, 00–2966 (La.5/4/01), 785 So.2d 763; *In re: Ferrouillet*, 99–3434 (La.6/30/00), 764 So.2d 948; *In re: Edwards*, 99–1783 (La.12/17/99), 752 So.2d 801; *In re: Sterling*, 08–2399 (La.1/30/09), 2 So.3d 408.

present circumstances.  In other words, the sanction of disbarment imposed at this point in respondent's profession, at the age of 67, is arguably akin to permanent disbarment and essentially a legal profession death sentence.  Whether respondent would ever be readmitted – even conditionally readmitted – is a question for another day, but the sanction of disbarment now precludes any consideration of it for five years from the date of this opinion.